# RADIO CITY MUSIC HALL CORPORATION v. UNITED STATES.

District Court, S. D. New York.
July 10, 1942.

McLanahan, Merritt, Ingraham & Christy, of New York City (Francis T. Christy and Richard Swan Buell, both of New York City, of counsel), for plaintiff.

Mathias F. Correa, U. S. Atty., of New York City (Jerome H. Doran, Asst. U. S. Atty., of New York City, of counsel), for defendant.

BRIGHT, District Judge.

Plaintiff asks for summary judgment in this action, brought under Title 28, U.S. C.A. § 41(20), to recover $1,079.99 plus interest, being the amount paid by it under protest for social security taxes claimed to be due under Titles VIII and IX of the Social Security Act U.S.C.A. Title 42, § 1001 et seq. and 1101 et seq.

Plaintiff operates the Radio City Music Hall in New York City, at which a weekly stage show is produced in conjunction with the exhibition of moving pictures. During the year 1938, it engaged the services of special artists, not regularly employed by it, to supplement its stage program. On January 30, 1939, it paid to the Collector of Internal Revenue, after a ruling by him that it was bound so to do, $1,318.04, being 2% of the amount paid to such special artists during that year, required by Title VIII of the Act, and, in addition thereto, the further sum of $167.79, being 3% of such payment, required by Article IX, less a credit for the amount paid for similar taxes to the State of New York. Of the $1,318.04, $405.84 was paid by the special artists. Plaintiff filed claims for refunds for the amounts paid, which claims were disallowed by the Collector in May and June, 1940.

It now seeks to recover $912.20, being the $1,318.04 less $405.84 paid by the artists themselves, and the $167.79.

The sole question involved is whether or not the special artists mentioned were "employees" or "independent contractors", under which latter classification no tax would be payable.

■ At the outset, the government contends that there can be no recovery, for the reason that under the Social Security Act, there is no specific authority whereby an employer can claim such a refund; that refunds provided for by the statute relate only to claims of employees and not of employers, under sections 1401 and 1411 of Title 26 U.S.C.A. Int.Rev.Code This contention seems to be refuted by Title 42 U.S.C.A. § 1106; Regulations 91, Article 504; Regulations 90, Article 503; 1 C.C.H. Unemployment Insurance Service, pars. 5339, 5831–5839; Title 28 U.S.C.A. § 41 (20).

■ The second preliminary objection is that neither in its complaint nor in its moving affidavits does plaintiff show that it has repaid to the special artists mentioned any of the taxes deducted under Title VIII aforesaid, nor that it has secured the written consent of such employees to entitle it to a refund in an amount equal to the taxes which they contributed, as required by Treasury Regulation 91, Article 504, subdiv. 4. But plaintiff, upon this motion, seeks to recover only the amounts actually paid out of its own treasury and does not ask for the return of the $405.84 contributed by the artists.

■ A similar claim for refund for unemployment insurance taxes paid for the same year to the State of New York, upon the amounts paid to the same special artists, was upheld by the Appellate Division of the Third Department on appeal by the plaintiff here from an adverse ruling of the Unemployment Insurance Appeal Board. Matter of Radio City Music Hall Corporation, 262 App.Div. 593, 31, N.Y.S.2d 284. The opinion there reported, as well as the testimony taken before the referee in the State proceeding, are annexed to the motion papers. I have not read the testimony as I do not think it is properly admissible upon this motion. It is not certified, it is not sworn to in this action, and it was not taken in the presence of the defendant or any of its attorneys, and they had no opportunity to cross-examine. So far as the defendant here is concerned, the hearing before that referee was purely ex parte and is not binding upon the defendant. It is probably true that the decision of the Appellate Division is not controlling in this case; but it is on all fours in point of fact and decides exactly the same question under a State statute not materially different from the Federal Act under review. It has added weight because it is clear that the New York statute was enacted to carry out the federal plan of social and unemployment security, to remedy the same evil, and to accomplish the same result; unemployment insurance taxes paid under the statute are permitted to be deducted from the tax payable to the federal government under the Act now in question. It is to be noted that Congress, in its consideration and enactment of the Social Security Act, was seeking to remedy economic insecurity due to unemployment, which was considered the greatest hazzard of our economic life. This remedy, it is said, might be accomplished by encouraging employers to provide more stable employment and by the systematic accumulation of funds during employment to pay benefits during non-employment.

■ The very object of the statute has obvious bearing upon the question here involved. It is clear, from a reading of the record submitted, that special artists, who have no regular employer, and never have had, and who are dependent upon the merit of their particular act to sell it in the amusement market, were never intended to be benefited by the accumulation of reserves to be paid to them in times of unemployment. Neither the person engaging their services, nor the time of their engagement, is stable or fixed. Their ability to sell depends entirely upon the amusement value of the commodity which they have to sell, and their earnings depend, not upon the fact that they are able or willing to work, but upon the fact that their particular performance has some popular appeal to the entertainment seeking public. What they should do and how they should do it, was theirs to develop and decide. They were merchants selling in the amusement market, and nothing else.

■ The regulations adopted under the Social Security Act contain these statements as to the distinction between "employee" and "independent contractor":

"Generally such relationship (that of employee) exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee.

"Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. * *

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, co-adventurer, agent, or independent contractor.

"The measurement, method, or designation of compensation is also immaterial, if the relationship of employer and employee in fact exists."

These regulations, it seems to me, do no more than declare the law as it has been settled by the decisions. Texas Co. v. Higgins, 2 Cir., 118 F.2d 636; Jones v. Goodson, 10 Cir., 121 F.2d 176; Williams v. United States, 7 Cir., 126 F.2d 129; Singer Mfr. Co. v. Rahn, 132 U.S. 518–523, 10 S.Ct. 175, 33 L.Ed. 440; Matter of Earle, 262 App.Div. 789, 27 N.Y.S.2d 310, affirmed without opinion 286 N.Y. 610, 36 N.E.2d 453; Matter of Litts v. Risley Lumber Co., 224 N.Y. 321–323, 120 N.E. 730, 19 A.L.R. 1147; Matter of Beach v. Velzy, 238 N.Y. 100–103, 143 N.Y. 805; Irwin v. Klein, 271 N.Y. 477–485, 3 N.E.2d 601; Matter of Morton, 284 N.Y. 167–172, 30 N.E.2d 369.

The distinction so often made between "employees" and "independent contractors" depends upon the "right to control" and not necessarily the actual control. However, in order to fix the relation as one of employer and employee, that right to direct must exist "not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished"; that is "not only as to what shall be done but how it shall be done". "In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and method for accomplishing the result, he is an independent contractor."

There can be no question here that the result to be obtained was the amusement of the public. Of that the plaintiff had full control. It furnished the place, the stage, the dressing rooms, the music, the lighting, and all of the instrumental music. Necessarily, to present a connected, harmonious and consecutive show, it had and exercised the right to specify who should take part in it, when he, she or they should perform, and how long the act would be, what color scheme should be used, a harmonious costume on the part of all participants, rehearsals to assure a connected and uninterrupted performance and the avoidance of embarrassing mishaps, a use of language or pantomine in no way offensive, the position on the stage and the manner of entrance and exit, not only for the convenience of the actor but also that the act might properly be seen and heard, and the substitution, on occasions, of music to fit in with the scheme of the entire stage show. These undoubtedly were requisites in order to make the whole performance successful and attractive to those who might pay to see and hear it.

As to the plaintiff's Rockettes, Glee Club, ballet and orchestra, that control was exercised; they were permanently employed and between them and the plaintiff concededly existed the relation of employer and employee. These employees

had nothing to say as to when and how they should do their part. Their every participation in the result was taught, trained, supervised and directed by the plaintiff. Because they were so continuously and intimately connected with the plaintiff, they enjoyed certain privileges and benefits not extended to the special artists. They were entitled to workmen's compensation benefits, hospital and other insurance, use of recreational and rest facilities and cafeteria, and, in the year in question, the right to purchase food. These were not the right of the special performers who could not and did not enjoy any part of them, except recreational facilities by special permission.

Contrasted to the foregoing, the rights of the special performers were not governed by many of the rules applicable to the regular employees. The plaintiff had no control over the method or means of the entertainment possibility of the act; that was the invention and development of the special performer, acquired by many weeks and years of steady application, thought and practice. That was their creation, whereas the acts of the regular employees were the creation and development of the plaintiff. The plaintiff did not and could not tell a juggler how to juggle, an acrobat how to tumble, a magician how to trick or mystify the eye, the special dancer how to dance or what steps to produce. The voice of the soloist was not that over which the plaintiff had any control. It was a natural acquisition, developed by the individual's study and training, in which the plaintiff never had any part. Even the monologue or dialogue was that of the artist and was not supplemented by the plaintiff, but was subject to deletion if it offended good taste, or was too long to fit into the time allotted to the act. The performance of the artist depended upon its reputation for entertainment, its popularity, its drawing power; that is what he sold to the plaintiff, and which he also offered to all others of the general public who might desire to purchase it. The artists were generally employed through an agent. Their act was contracted for, and if not continued for the period of the contract, was required to be paid for in full in any event. The particular feature was purchased as any other commodity, and was paid for by plaintiff in the same way and by the same kind of a check that it used in the purchase of merchandise and in the payment of the fees of lawyers and certified public accountants. There was no permanent employment, only occasional and sporadic engagement. The artists in many instances were not even required to rehearse, except as it might be necessary for them to know when they were to go on, where, and at what cue. They had the right, infrequently exercised, to contract for engagement at other places of amusement provided there was no interference. In other words, theirs it was to decide how the act should be done; the plaintiff's, where and when. The artist decided and carried out the means and methods by which the act produced its popularity and amusement value. The plaintiff furnished the place and setting appropriate for the whole performance.

The testimony of the plaintiff's show producer, not contradicted, clearly reveals the difference between the employee and these special artists. The scheme and plan of the show for any particular period was obviously devised before the employment of the special artists. To fill in the open spots of that program and to round out the show for a good performance, special talent was engaged at a price far above anything paid to the regular performers and employees, and dependent entirely upon the drawing power, popularity with audiences and their otherwise continuance employment. The price fixed for the particular act was bargained for the same as would be for any other commodity. The training of the special performers was all accomplished outside of the Music Hall and was nothing over which the plaintiff had any control. The plaintiff sometimes changed the music but with the permission of the artist. They were each left "to do their own stuff", to perform his act freely. The plaintiff did not reserve the power to pass upon any change in personnel of the act while it was playing. The artist was told what the nature of the performance was to be, but "he works out the steps himself". They were not told how to do their acts because their acts were usually established routines when engaged. In the event of a deletion, the artists were not told what to substitute. It seems to me that the undisputed facts show clearly that under the definition of the Internal Revenue Department, above quoted, the artists are "independant contractors" and that no tax is required to be paid.

The government takes the position that if the plaintiff is entitled to any relief, it would be only for the refund of the taxes paid upon the five special artists whose testimony was taken before trial. But I think the testimony of the plaintiff's producer shows that the method of engagement of special artists, as revealed by the five who testified, was generally employed with all of the persons upon whose payments a refund is sought. There is no proof to the contrary.

Judgment will, accordingly, be directed in favor of the plaintiff. Settle order on notice.