**CLUB HUBBA HUBBA, a co-partnership, Plaintiff,**

**v.**

**The UNITED STATES of America and Vaughn W. Evans, District Director of Internal Revenue for the District of Honolulu, Hawaii, Defendants.**

**Civ. A. No. 2093.**

United States District Court
D. Hawaii.

March 31, 1965.

6. 29A C.J.S. Eminent Domain § 143, p. 603.

Kazuo Oyama, Honolulu, Hawaii, for plaintiff.

Herman T. F. Lum, U. S. Atty., District of Hawaii, by Peter A. Donahoe, Asst. U. S. Atty., Jerome Fink, Trial Atty., Dept. of Justice, for defendants.

TAVARES, District Judge.

This is a civil action for recovery of employment taxes (so called FICA or social security taxes and FUTA or unemployment insurance taxes) paid by the plaintiff—a partnership doing business as the CLUB HUBBA HUBBA,—with respect to club entertainers, brought from Japan, whose services were under contracts with option to renew.

Plaintiff seeks recovery of Federal Insurance Contributions Act taxes (26 U.S. C. §§ 3101, 3111) for all quarters from the quarter ended March 31, 1955 through the quarter ended December 31, 1958 and Federal Unemployment Act taxes for the years 1956 and 1957. (26 U.S.C. § 3301) These taxes were assessed by the Commissioner of Internal Revenue on a determination that the entertainers in question were employees of plaintiff, so that their employer was required to pay employment taxes on their account.

Plaintiff paid these taxes, filed timely claims for refund, which were disallowed on November 16, 1960. Plaintiff instituted this action on October 30, 1962. Jurisdiction of the Court rests on Section 1346(a) (1) of Title 28, United States Code.

Plaintiff is a partnership composed of John R. Matsuoka, Evelyn Shizuko Matsuoka, Tadami Matsuoka and Takao Matsuoka, doing business as Club Hubba Hubba, (hereinafter sometimes also called the "Club") a night club or cabaret located at 25 N. Hotel Street, Honolulu, Hawaii.

During the period here included, namely 1955–1958 (hereinafter called the "tax period") as well as during the year 1954, the Plaintiff engaged in the sale of food and drink and furnished entertainment during the evening hours, with an increase in food and drink prices during the period of entertainment. During the tax period the Club gave three floor shows a night on weekdays and four shows a night on Fridays, Saturdays and holidays.

The Club's "floor show"—which in fact took place on a small elevated stage at the rear of the establishment—utilized as the principal attraction various featured performers, usually strip-tease dancers, whose services were retained on a short term (usually three week) basis. In addition to these "star" performers, the Club had a regular group of girl performers (ranging from four to nine persons), who were described in Club advertising as the "Hubba Hubba Girls," or "Cherry Blossom Sisters" or some similar collective named.

Practically all of the performers making up this regular group were

brought to the Club from Japan under 6-month contracts, with option to renew.[1]

In addition to wages after taxes of $150.00 a month, plaintiff furnished to these performers round trip transportation from Japan, including a specified advance payment for pocket money and preparation for the trip, living quarters and meals, and medical and dental care and hospitalization if required, and life, accident and health insurance in a specified amount.

The performers lived in a home rented by plaintiff. They cooked their meals, except those they ate while at the Club and they performed other household duties including cleaning.

Plaintiff withheld income taxes from the cash amounts it paid to these entertainers pursuant to the provisions of Section 1441, Internal Revenue Code of 1954, as amended.

The plaintiff filed Employers Quarterly Tax returns (Forms 941) with the Director of Internal Revenue under the Federal Insurance Contributions Act for the various quarters during the period 1955–1958 inclusive. Plaintiff also filed annual Federal Tax Returns of Employers (Forms 940) for the years 1956 and 1957. Plaintiff did not include on those forms the amounts paid to these performers it had brought from Japan, taking the position that these entertainers were not employees for federal employment tax purposes.

On the audit of plaintiff's returns, the Commissioner of Internal Revenue, through his delegates, determined that these entertainers were employees for federal employment tax purposes, and accordingly assessed the following deficiencies: FICA taxes for all quarters 1955–1958 inclusive of $3,518.04 (consisting of $3,081.81 tax and $476.66 interest) and FUTA taxes for 1956 and 1957 of $118.12 (consisting of $103.45 tax and $14.67 interest).

Plaintiff paid these deficiencies, filed timely claims for refund, which were not allowed, and this action was timely commenced.

The ultimate issue is whether the entertainers brought by plaintiff from Japan under contracts with option to renew, were employees for purposes of federal employment taxes.

At intervals of from six months to a year[2] a Club partner would go to Japan and sign up individual entertainers for service in Honolulu at the Club's place of business. Each such individual would sign in Japan a written contract with the Club, which would then pay each entertainer's expenses to Hawaii.[3] These entertainers were professional dancers and singers who worked in night clubs and theaters in Japan. Each such individual while engaged under such contract, would be paid separately by the Club.

According to the testimony of John Matsuoka, one of the Club partners who usually did the signing up of these entertainers, after he had, on each of his talent recruiting trips to Japan, selected a group of entertainers, they would "by custom" and allegedly without his intervention, choose a stage leader, based on experience and seniority, who would then become a sort of director of the group and speak for them from then on so long as that group was engaged in perform-

---

1. There was some testimony to the effect that one or two entertainers may have signed up for four months or at least less than six months, with option to renew.

2. With the exception of one missing contract, the contracts were admitted in evidence as Exhibits 1–A (dated 4/7/54); 1–B (signature page only 12/13/54); 1–C (7/14/55); 1–D (3/6/56); 1–F (3/6/57); 1–G (3/30/57); 1–E (3/10/58); 1–H (2/18/58).

3. In practically every case, although each individual entertainer signed for himself, all or most of the group signed up on that trip would sign one contract, i. e., there would be multiple signatures —the partner signing for plaintiff and each entertainer signing on the same page with the others, but for himself only. The masculine here is used to include the feminine, most of the entertainers being girls.

ing their services for the Club. This selection, he admitted, was subject to his approval (i. e., the approval of the Club represented by him), but he claimed that this approval was merely a "ceremonial" approval because he had always approved whatever selection they made. Be that as it may, the Court finds he had the power of disapproval, though he never chose to exercise it.

The entertainers in each group would then rehearse and work up their acts without interference by the Club, but it seems fair to infer, more or less under the leadership and direction of the selected leader.

The Japanese shows would change ordinarily every two weeks, but sometimes at the discretion of the management, a show would go on for three weeks before it would change.[4] These were the Japanese shows; but there were also "American" acts or shows, as Matsuoka called them, not involved in this action, which would go on without change from week to week until the particular contract expired.

The acts performed by these Japanese entertainers during the tax period included the following: Japanese singers; jazz singers; Kabuki dancers; chorus girls; jugglers, acrobats; Japanese instrument players, guitar players; Japanese drums; and folk dancing. The "American" acts not involved in this case included roller-skating, bicycling, unicycling, pantomine; exotic or strip-tease dancers, and Mexican singers.

Although the management claimed they did not interfere in any way with the preparation of the shows, they admitted that a new proposed program was shown to them in advance of practice for the new show, and they had a right to approve or disapprove and to require particular portions and acts to be cut out, and to require new or different acts, but

this power was exercised rather infrequently.

Practice for a new show took about two weeks, practice being undertaken at the Club and at the residence hired by the management for the performers. Management furnished the stage, the permanently engaged orchestra, and for most of the period, a Master of Ceremonies who announced the various acts and performed himself, supervised the lighting, and furnished some of the props and costumes, although the actors usually furnished their own, with occasional allowances furnished by the management or with materials paid for by management. In advertising in the press, usually the girls were referred to as the Hubba Hubba Girls, but they were also sometimes referred to by collective names of a group and were introduced on stage by their individual names, by the Master of Ceremonies, who was usually an American.

The plaintiff places its main reliance upon Radio City Music Hall Corporation v. United States (2 Cir. 1943) 135 F.2d 715, affirming (S.D.N.Y.1942) 50 F.Supp. 329. The defendant on the other hand, relies principally upon Ringling Bros.-Barnum & Bailey Combined Shows v. Higgins (2 Cir. 1951) 189 F.2d 865, and Matcovich v. Anglim (9 Cir. 1943) 134 F.2d 834 and Westover v. Stockholders Publishing Co. (9 Cir. 1956) 237 F.2d 948. Under the foregoing and other facts brought out by the evidence or stipulated to, this Court believes that the relationship in this case between plaintiff and the entertainers in question contains elements and combinations of elements not present in the Radio City case, which distinguish it from that case and cause it to fall over the line into the category of employer-employee rather than that of independent contractor as a matter of "economic reality," and which more clearly fit into the principles of the cases cited

4. Each Japanese show for a particular night would have two *different* programs. On the nights when three shows were given, the programs would be No. 1, No.

2 and No. 1; on Fridays, Saturdays and holidays when four shows were given, the programs would be No. 1, No. 2, No. 1 and No. 2, all in that order.

by the defendant than those of the Radio City case.

(1) In Radio City the contracts were on a *weekly* basis and ordinarily oral, with nothing said in the decision about any right of renewal, whereas the plaintiff's contracts here were all for six months, with one or two exceptions, with right of renewal, which was apparently construed in practice as permitting the plaintiff to "renew" for any period it desired, running from one month to twenty-four months.

(2) In Radio City the plaintiff operated a theater, *primarily* for motion picture features, and the acts of the performers there concerned were used to fill in a minor portion of the program including intermissions. Here, the acts of the entertainers signed up by plaintiff were a part of the main program itself, not incidental fillers.

(3) In Radio City the plaintiff employed on a permanent basis the orchestra, glee club, and corps de ballet, as supporting cast for its regular routine. Here, the supporting cast and choruses were the performers themselves, or some of them, who are claimed to be independent contractors. Moreover, the so-called "American" entertainers were apparently considered a separate group, *not* employees in a clearer sense, with fewer perquisites and privileges and less supervision and regulation, and generally shorter terms without changing their shows.

(4) In Radio City, the regular employees (orchestra, supporting cast, glee club and corps de ballet) had special employee privileges and benefits (workmen's compensation, hospital and other insurance and use of recreational facilities) not enjoyed by the actors found to be independent contractors, with one partial exception as to recreational facilities, which could be used by the independents with special permission. Here, practically all the special privileges and benefits allowable in Radio City to the permanent employees, were available to the class claimed to be independent contractors, and more (room and board, life, accident and health insurance, and medical and dental care and hospitalization if needed).

(5) In Radio City the actors had the right, albeit infrequently exercised, to contract for shows with other parties provided there was no interference with Radio City work. Here, not only did the plaintiff contractually restrict the right of each entertainer to work for anyone else, and not only did it exercise that right even when the employment was terminated, to prevent a rival night club from getting the benefit of such entertainer's services, but it also bound the entertainer to perform at such other places as plaintiff should designate, subject to approval of Federal officials. Moreover, the plaintiff exercised that right and collected the fruits of such "outside" employment, thereby in effect selling the labor or artistry of his captive entertainers for plaintiff's profit.

(6) In Radio City if an act was performed by a troupe or group, a *leader designated by that group or* the *owner* of the act generally spoke for the group and was paid for the group. Here, each total group of supposedly separate entertainers, or separate groups of entertainers, was compelled to choose in Japan, before they embarked for Honolulu, a "Tacho" or group leader whose selection was subject to plaintiff's approval and who thereafter spoke for the entire group of entertainers or subgroups of entertainers. The fact that the plaintiff's evidence purports to indicate that the power to disapprove was never exercised, still does not derogate from the exercise of that power.

(7) While some of the controls held not to render the actors employees in Radio City are very similar to those in the present case—e. g. furnishing by plaintiff of stage, lighting, orchestral music, attendants, occasional costumes, the right of producer to direct staging according to plaintiff's requirements for the whole overall program, to fix rehearsal times and the number of performances per day, requiring promptness in attendance, prescribing order of songs

and dances, determining the time an "act" was to come on stage, requiring omission of parts of dialogue or other features as "unsuitable" to the plaintiff's audience, making an effort to "weld" the different "acts" into a harmonious program, but giving the actors opportunity to perform their acts without interference, and in a very "trivial" number of instances requiring an actor to commingle with other actors to perform a skit, etc.—these are not sufficient of themselves to bring the present case within the lower degree of total control which caused the court in Radio City to find the actors independent contractors.

(8) Besides the distinguishing features hereinabove pointed out, additional features indicating greatly increasing the plaintiff's degree of total control over that in Radio City include: (a) advertising publicly all members of a group as the "Hubba Hubba Girls," with also occasional reference to subgroups by their subgroup collective names; (b) a very much greater degree of control over the entertainers here as to hours of work and practicing, and (c) restrictions on the right to leave the club premises between programs (a restriction not imposed on the "American" performers considered also apparently as independent contractors). These are claimed as necessary in the nature of things because of the contractual or voluntarily assumed obligations of the plaintiff to furnish transportation, food and lodging, etc., but they still add to the totality of the control exercised by the plaintiff over the everyday actions of the entertainers, in excess of that exercised in Radio City.

(9) Finally, though there are a few other points of similarity and dissimilarity between the two cases not herein specifically discussed, a most significant control in the present case was the apparently invariable practice of plaintiff to impound the passport of every entertainer and hold it until he departed from Honolulu. No power to do this is contained in any contract, nor was any requirement of law or regulation giving such power to plaintiff called to the Court's attention. Plaintiff attempted to justify this on grounds of "necessity to protect plaintiff's investment" in these entertainers. However, it is hard to imagine a more coercive measure, short of a threat of force, calculated to control the actions of these entertainers, unschooled in their legal rights in this country, than holding their passports in a country foreign to them.

The foregoing are sufficient, in this Court's view to bring the present case out of the category of independent contractors and over the line into the class of employees covered by the federal tax statutes above cited within the principles enunciated by the cases cited by the Government, supra.

To round out the picture the Court could also advert to other exhibits in the case, one (Exhibit "A") a letter from plaintiff's counsel to the District Director of Immigration and Naturalization protesting the granting of a visa to an entertainer who had finished her contract with plaintiff and wanted to stay over and be employed by another night club, in which the plaintiff is referred to as the "employer" and the entertainer as the "employee," and two contracts (Exhibits H & I) of plaintiff with the American Guild of Variety Artists under which plaintiff contracts that all "artists," which includes these entertainers, "shall be considered as employees and not independent contractors," etc. These are not conclusive, but at least they do *not* derogate from the conclusions herein reached by the Court.

Also the Court might mention the contention made by plaintiff that the taking out of Hawaii State gross income tax licenses in behalf of the entertainers indicated their independent contractual status. This practice, however, far from one voluntarily and understandingly adopted by the entertainers, was one imposed arbitrarily and ex parte by the plaintiff, whose accountant merely made a practice of causing to be issued these licenses, which are always issued by the State on request to almost anyone with no questions asked. Moreover, these self-

serving documents prepared or provided by an interested party to aid its cause are not even consistent with the facts plaintiff claims these licenses support. If plaintiff's contentions were correct, such a license should have been taken out *separately* by each individual entertainer in his sole name, and not by one of them, presumably the elected "Tacho" or leader, for all of the group.

Counsel will prepare more detailed Findings of Fact and Conclusions of Law in favor of defendant, pursuant to Rule 4(d) of this Court.