**303 WEST 42ND STREET ENTERPRISES, INC.,**
Plaintiff,

v.

**INTERNAL REVENUE SERVICE and The United States of America,**
Defendants.

**No. 93 Civ. 4483 (LBS).**

United States District Court,
S.D. New York.

Feb. 28, 1996.

Bailin & Seplowitz, New York City (William Seplowitz, Leonard Bailin, of counsel), for plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Glenn C. Colton, Asst. U.S. Atty., of counsel), for defendant.

SAND, District Judge.

Plaintiff corporation, 303 West 42nd St. Enterprises, operates an "adult entertainment" center known as Show World. The Internal Revenue Service assessed a deficiency against Show World for employment taxes on dancers working in Show World's one-on-one fantasy booths. Plaintiff paid part of the assessment and has instituted this action for refund. Plaintiff moves for summary judgment on its refund claim. The Government cross-moves for summary judgment on its counterclaim for employment taxes for all payroll periods during 1989 and 1990. We deny plaintiff's motion for summary judgment and grant the Government's motion for summary judgment.

## BACKGROUND

Plaintiff corporation, 303 West 42nd St. Enterprises, Inc., operates an adult entertainment facility at 42nd Street known as Show World. Show World provides a variety

of adult entertainments including a movie theater showing pornographic movies, single occupancy booths for the individual viewing of pornographic videos, live stage shows, and booths, known as one-on-one fantasy booths, where customers can communicate with performers, known as "visual telephonic communicators". The employment status of these booth performers, i.e. whether or not they are employees, is the crux of the instant dispute.

According to Show World's chief financial officer, the one-on-one booths account for 15–30% of the company's gross revenue. Deposition of Scott Wexler ("Wexler Dep".), June 29, 1994, at 18. The booths consist of two parts, with a glass partition separating the booth performer from the customer. As soon as the customer deposits a coin, the performer becomes visible, and the telephones become operational. What happens inside the booth is private, determined by the number of coins the customer deposits and conversation with the performer. During the time when the performer is visible to the customer the performer engages in a sexually provocative routine. *See* Footnote 5 *infra*, Notice of Motion, Exhibit 6, August 16, 1995.

Many of these routines have set prices. *Id.* Patrons negotiate with the performers for the amount to be paid for the selected performance. The patron pays the performer directly by inserting money into a slot provided for this purpose. The performer keeps all of the monies so paid. In addition to these monies, the customer inserts coins into the deposit box in order to keep the window clear and the telephone operative. Show World sets the price of the tokens, sells them to its patrons, and sets the amount of time that each coin will allow the customer to communicate with the performer. Deposition of Audrey Metzger, June 21, 1994, 12–14. At the end of the day (or night), when the performer has finished her shift, the tokens are collected and the visual telephonic communicator is paid 40% of the coins deposited; Show World keeps the additional 60%. Wexler Dep. at 24. The performers are then asked to sign a purported lease agreement, which specifies that Show World may withhold the performer's 40% as a security de-posit for the reservation of the booth for the rest of the week. Id. at 25.

Show World argues that as a result of this lease, the visual telephonic communicators are tenants. In support of its contention that it enters into a landlord-tenant relationship, rather than an employer-employee relationship, Show World argues that its twenty-one booths are all similar. The performers rent the booths by paying a fee equal to 60% of the coins deposited in their booth boxes during their shifts. A lease agreement is signed by the performer after her first shift is completed. At that time, she is able to lease the booth for future shifts, although the record indicates that booths are never leased for more than a couple of days.

Believing booth performers to be employees rather than tenants, on November 26, 1991, the Internal Revenue Service ("IRS") issued Show World a Notice of Deficiency in the amount of $268,313.26 for additional employment taxes and interest for all periods encompassing the 1989 and 1990 calendar years. Show World paid $24,296.74 in assessed deficiencies for the quarter ending December 31, 1989. Several weeks later, the adult entertainment company filed an administrative claim for a refund of the amount paid. Show World's claim for refund was denied by the IRS.

By complaint dated June 24, 1993, Show World commenced the instant action seeking reimbursement of the $24,296.74 under the theory that a safe harbor provision, § 530 of the Revenue Act of 1978, prevents the government from treating Show World's booth performers as employees for the purpose of assessing employment taxes. In reply, the Government asserted that the safe harbor provision is inapplicable to Show World. The Government then filed a counterclaim against Show World for employment taxes in the amount of $249,773.79 plus interest for the quarters ending March 31, 1989, June 30, 1989, September 30, 1989, March 31, 1990, June 30, 1990, September 30, 1990 and December 31, 1990. Thereafter, plaintiff Show World moved for summary judgment on its refund claim and the Government cross-moved for summary judgment on its deficiency assessment.

Each motion before the Court requires the resolution of two questions. First, does the safe harbor provision of § 530 protect a company whose alleged industry practice has been to characterize its workers as anything but employees. Second, if § 530 does not apply, are the visual telephonic communicators to be considered employees of adult entertainment companies for employment tax purposes. We proceed to address these issues.

## DISCUSSION

This case is before us on uncontested facts. The parties debate only whether, on the facts presented, the safe-harbor provision applies and whether visual telephonic communicators are employees under the tax code. As both motions thus turn wholly on questions of law, summary judgment is the appropriate vehicle for their resolution.

### A. The Employment Tax and Section 530

The classification of workers as either employees or non-employees under the Internal Revenue Code determines both the nature and quantity of taxes imposed. If an employer-employee relationship exists, the employer is subject to social security taxes under the Federal Insurance Contributions Act (FICA) (§ 3101) and unemployment taxes under the Federal Unemployment Tax Act (FUTA) (§ 3301). If there is no employer-employee relationship, the employer is not subject to FICA and FUTA, rather, the worker pays self-employment taxes under the Self–Employment Contributions Act (SECA) (§ 1401–1403).[1]

In addition to FICA and FUTA, the Internal Revenue Code requires employers to withhold Federal income taxes from employee paychecks in accordance with procedures proscribed by the Internal Revenue Service.

Using the employee's Withholding Allowance Certificate and a table issued by the IRS, the employer computes the correct amount of Federal income withholding tax. The computation is based on the number of withholding allowances claimed, the employee's wages, and the frequency of payroll payments. Joint Committee Print, JCX–27–92, Present Law and Issues Relating to Misclassification of Employees and Independent Contractors for Federal Tax Purposes. If there is no employer-employee relationship, however, no income tax withholding is required.

Historically, whether an employer-employee relationship existed was determined under a common law test. If the person contracting for the work had the "right to control not only the result of the service, but also the means by which that result is accomplished," the worker was an employee. Treas.Reg. 31.3401(c)–(1)(b), cited in Committee Print; Rept. No 100–76, 100th Cong., 1st Session. At present, the term "employee" is defined by Section 3121(d) of the Code to include, "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

In response to controversies over employment status between taxpayers and the IRS, Congress enacted section 530 of the Revenue Act of 1978 (P.L. 95–600).[2] Section 530 allows a taxpayer to treat a worker as a non-employee, regardless of the individual's actual status under the common law test discussed *supra*, as long as the taxpayer's treatment of the worker for tax purposes has been consistent and a reasonable basis exists for such treatment. A reasonable basis is considered to exist if the taxpayer reasonably relies on 1) judicial precedent; 2) a past

---

**1.** Prior to 1990, the employment tax structure significantly favored independent contractors over employees. Until 1983 the FICA tax rate on the employer and employee was higher than the SECA tax rate. In 1989, the tax rates were equalized; however, a self-employed person is still entitled to an income tax deduction for a portion of SECA taxes. Joint Committee Print; JCX–27–92, Present Law and Issues Relating to Misclassification of Employees and Independent Contractors for Federal Tax Purposes.

**2.** Although § 530 was never codified, it is reproduced in the notes following 26 U.S.C. § 3401. Section 530 was originally intended to provide interim relief to taxpayers involved in employment tax controversies with the IRS. Its provisions were extended indefinitely by Section 269(c) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), P.L. No. 97–248, 96 Stat. 324, 552 (Sept. 3, 1982).

failure of the IRS to raise such an employment tax issue on audit; and 3) "long-standing recognized practice of a significant segment of the industry in which such individual was engaged." 26 U.S.C. § 3401. In relevant part, section 530 states:

> "If for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and in the case of periods after December 31, 1978, all Federal tax returns ... required to be filed by the taxpayer with respect to such individual for such periods are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee, then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee ... A taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment for such period was in reasonable reliance on ... long-standing recognized practice of a significant segment of the industry in which such individual was engaged."

■ The taxpayer has the burden of proving that he satisfies the requirements for Section 530 relief. *Springfield v. U.S.*, 873 F.Supp. 1403, 1412 (S.D.Cal, 1994); *In re Arndt*, 158 B.R. 863, 870 (M.D.Fla.1993). In an attempt to meet its burden, Show World relies upon the third prong of the reasonable basis test, long-standing industry practice, to assert that the safe harbor provisions of § 530 exempt it from FICA, FUTA and withholding taxes.

Show World contends there is a long standing industry practice of treating visual telephonic communicators as anything but employees. Affidavit of Ron Martin, dated August 14, 1995, ¶ 4; Affidavit of Thomas Parron ("Parron Aff."), dated August 14, 1995, ¶ 8. But although there may be an industry practice of not treating these performers as employees, there is no long-standing practice of treating them as falling into another single specific category. Rather, the industry appears to utilize two classifications, tenant and independent contractor. Citing the practice of characterizing booth performers as either tenants or independent contractors, plaintiff has documented the adult entertainment industry's choice to classify its performers as non-employees for employment tax purposes.

Show World has never treated its visual telephonic communicators as employees for employment tax purposes. As discussed previously, Show World contends that its performers are tenants who pay rent equal to 60% of the deposited coins, sign leases after the first shift, and lose a security deposit of their first days wages (40% of the coins) if they fail to appear for the future shifts contracted to in the lease. If the performer generates no revenue in her booth's coin box, there are no proceeds to divide and Show World gets no rent. A copy of the per diem lease appears in Exhibit 7 of Plaintiff's Notice of Motion. In the alternative, Show World contends that its booth performers, are independent contractors, purchasing their own props and costumes and charging their own rates for various performances agreed upon by the dancer and the customer.

The relevant issue therefore is whether the safe harbor provision of § 530 protects a company whose alleged industry practice has been to characterize its workers as anything but employees without a consistent opinion as to a single other classification. Based upon the fact that 1) the industry cannot agree on a uniform practice and 2) the language and legislative history of 530 manifests an intent to rectify unfairness and surprise rather than provide a loop hole, this Court answers the question in the negative.

No Single Industry Practice

■ The evidence submitted indisputably demonstrates that no single long-standing industry practice exists. Show World primarily contends that its booth performers are tenants. In a December 23, 1991 letter, plaintiff's counsel alleged that each of its visual telephonic communicators was a tenant and that tenant treatment is "common in the industry." Notice of Cross–Motion, Ex. A, December 23, 1991, letter signed by Leonard Bailin; *see also,* Parron Aff. ¶ 6 ("For purposes of employment taxes, Show World did

not treat any booth tenants as employees for any period."). Less than one month later, however, on January 15, 1992, plaintiff's counsel represented that the "entire industry" issues to booth performers Form 1099, the tax form distributed to independent contractors. *Id.* With evidence of both tenant and independent contractor treatment, it seems clear that the only classification on which the industry agrees is that of non-employee.[3] Indeed, it is undisputed that as far as a specific classification is concerned, there is no single long-standing practice in the adult entertainment industry of characterizing visual telephonic communicators. Plaintiff's 3G Statement ¶ 13.

Legislative History of Section 530

Historically, section 530 was enacted as a fairness provision. Joint Committee Print; JCX–27–92. It was designed to alleviate the burden employers faced when the IRS prevailed in reclassifying workers as employees. Reclassification often resulted in employer liability for substantial portions of employee FICA and withholding tax although the employee might have fully paid all liabilities for self-employment and income taxes. In light of this occurrence, Section 530 was promulgated to ease the employer's burden. As the Second Circuit noted in *U.S. v. MacKenzie*, 777 F.2d 811 (2d Cir.1985) *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986), "a good faith taxpayer who was determined to have made an honest

> mistake might be liable for enormous sums that should have been withheld from employee's paychecks but were instead paid to the workers. Thus, a limited safe haven was set up for those employers that manifested a 'reasonable basis' for their treatment of employees as independent contractors."

**3.** *See* Affidavit of William Seplowitz, August 15, 1995, ¶ 6 ("the long standing practice of virtually the entire adult entertainment industry [is to] treat[ ] performers as not being employees for tax reporting purposes, and more particularly, [it is] the long standing practice of every operator in the industry offering "one-on-one booth facilities of not treating booth tenants as such."); Parron Aff., August 14, 1995, ¶ 8, ("virtually all of the New York operators of adult entertainment facili-

■ Section 530 was not designed to aid an industry ambivalent about the particular employment classification of its workers. Rather, the statute was designed to protect those who in good faith reasonably relied on a specific practice of classification and were surprised to discover that the IRS took another view.

The courts have distinguished between reasonable and unreasonable bases. Safe harbor protection was available to a business that provided hospitals with nurses to fill staffing needs when the business had consistently characterized the nurses as independent contractors and followed an industry-wide practice of doing so. *Hospital Resource Personnel v. U.S.*, 860 F.Supp. 1557 (S.D.Ga.1994). Safe harbor protection was not available "where various segments of an industry [were] using contradictory practices." *Springfield* at 1412.

The lack of a single practice within the adult entertainment industry, combined with section 530's circumscribed nature and its underlying objective of mitigating the harshness of reclassification by preserving fairness, deprives Show World of safe harbor protection. Section 530 was simply not intended to be a loop hole for taxpayers bent on avoiding known tax consequences. Show World has not sustained its burden of showing an entitlement to § 530 treatment.

**B. Employee or Independent Contractor**

Since the safe harbor provision of § 530 is inapplicable to Show World, the next issue to be considered is the status of the visual telephonic communicators. If, as a matter of law, the booth performers are employees, then Show World is subject to employment taxes under FICA, FUTA, and withholding statutes. If they are not employees, then Show World is not liable and the Govern-

ties did not treat performers as employees for tax reporting purposes. Further, based upon my knowledge of the industry gained of my years of experience, I can state, unequivocally, that there have been no operators of facilities with one-on-one booths, since their introduction into the adult entertainment industry in 1979 and up to the present date, whether in New York or elsewhere, who have treated the performers as employees for tax reporting purposes.").

ment's summary judgment motion must be denied.

■ Historically, the Commissioner's determination of tax liability, as enunciated in a statutory note of deficiency, is entitled to a presumption of correctness. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Day v. Commissioner*, 975 F.2d 534 (8th Cir.1992); *Brooks v. U.S.*, 280 F.2d 370 (5th Cir.1960). The taxpayer has the burden of proving that the Commissioner's determination of employee status is erroneous. *Beatty v. Halpin*, 267 F.2d 561 (8th Cir.1959); *Marvel v. U.S.*, 719 F.2d 1507 (10th Cir.1983).

■ Addressing its burden, Show World's primary argument is that its booth performers are tenants. Supporting this contention, Show World asserts that booths are leased to the performers under a per-diem agreement. Rent is variable; the visual telephonic communicators pay 60% of the gross revenue generated by the coin box in their particular booths. If the performer generates no revenue in the fantasy booth's coin box, there are no proceeds to divide and Show World receives no rent under the agreement. At the other end of the spectrum, if the performer generates $100 in coin deposit revenue, the proceeds are divided and Show World receives 60% of the revenue, or $60, as rent. The remaining 40% is paid to the performer, however, a standard provision in the purported lease agreement stipulates that a performer may forfeit the 40% generated on her first day if she fails to appear for a future booking contracted to under the lease term. This provision and all other provisions are stipulated in a short-form lease, which is signed only *after* the visual telephonic communicator has finished her first day of performance. A copy of the per diem lease appears in Exhibit 7 of Plaintiff's Notice of Motion.

In addition to the booth-performer-as-tenant argument, Show World contends that its booth performers are independent contractors, purchasing their own props and costumes and charging their own rates for vari-

ous performances agreed upon by the dancer and the customer. According to this argument, the visual telephonic communicator uses the booth as an opportunity to perform any acts that an individual patron may desire and for which the customer is willing to pay. The prices for each sexual act are negotiated by the patron and the performer. The patron then pays the performer directly by inserting money into a slot provided for this purpose. The performer retains the full fee charged to a patron for the individual performance. Therefore, at the end of the shift, the performer takes home 100% of money passed through the slot and 40% of the value of the coins deposited in the booth's coin box.

Based upon these factors, Show World contends that its booth performers are tenants and/or independent contractors who sign leases to rent out booth space and utilize the booth to conduct their own independent businesses.

In assessing the validity of Show World's contention, IRS revenue rulings, in conjunction with Treasury Regulations and case law, have set forth twenty common law factors to be considered. These rules have been enumerated in Rev.Rul. 87–41, 1987–1 C.B. 296.[4] Each factor is analyzed below in light of the particular attributes of Show World's relationship with its booth performers.

### 1. Instructions

Revenue Rule 87–41 states that a worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. *In re Compass Marine Corp.*, 146 B.R. 138, 148 (E.D.Pa.1992). Despite the fact that Show World employees do not themselves view the booth performances (as all performances are exclusively for the coin-paying customer) or set the prices for the particular performances given (all the proceeds of which are kept by the performer), Show World nevertheless exercises considerable control over the performers. Show World monitors the booths by audio in order to insure compliance with its instructions.

---

**4.** *See* Treas.Reg. (26 C.F.R.) § 31.3121(d)–1(c)(2); *see also, Avis Rent A Car System v. U.S.*, 503 F.2d 423, 429 (2d Cir.1974); *In re Arndt*, 158 B.R. 863, 867–68 (M.D.Fla.1993).

*Time*

Booth performers have the discretion to pick either one of two shifts, an evening shift or a daytime shift. However, once engaged in performance during a shift, the visual telephonic communicator must work the entire shift in order to receive compensation. The performer cannot leave the premises for any reason if he or she wishes to continue performing during the shift.

*Place*

All performances are exhibited in the one-on-one booths. Show World controls the dimensions and maintenance of the booths. Visual telephonic communicators may select the booth in which they wish to perform, however control over the booths including the amount of viewing time each coin provides is strictly controlled by Show World.

*Manner*

In regards to the manner in which the work is performed, Show World's customers control the individual performance based upon 1) the number of coins deposited and 2) the explicit act requested by the patron over the telephone. Indeed the very purpose of one-on-one booths seems to allow the patron to custom-tailor the performance to his or her wishes. Performers may choose their own clothing, as employees often do, and may even choose their own sexual devices. Yet the latitude over sexual acts is strictly curtailed by Show World. By audio monitoring the booths, Show World enforces a limit to this customization by preventing certain sexual acts and transactions from occurring.

## 2. Training

Traditionally, the training of a worker by management or an experienced employee is indicative of an employer-employee relationship because it demonstrates the employer's desire to have the work performed in a particular fashion. *Moore v. U.S.*, 1992 WL 220913, at *2 (W.D.Mich.1992). However, given the nature of the services performed, communication through sexually provocative acts, there is little need for formal training. *See Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 328 (5th Cir.1993) ("[Topless] dancers do not need long training or highly developed skills to dance."). Yet even with the diminished need for instruction, Show World trains its new visual telephonic communicators by allowing them to observe the performances of others. Metzger Dep. at 16.

## 3. Integration

■ When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the worker who performs those services is more likely to be considered an employee than an independent contractor. Rev. Ruling 87–41. Show World argues that there is no integration of the performer's services into its business operations because the performances are for the benefit of the general public. This argument is specious. Show World receives 60% of the coin value deposited in the one-on-one booth boxes. Wexler Dep. at 24. These receipts encompass between 15–30% of Show World's gross revenue. Wexler Dep. at 18. The revenue earned from the performance of the visual telephonic communicators effects Show World's continued viability as a purveyor of adult entertainment.

## 4. Services Rendered Personally

If a worker's services must be rendered personally, it is presumed that the employer is interested in the methods as well as the results. Rev.Ruling 87–41. Show World prohibits booth performers from hiring their own substitutes to work their shift. Metzger Dep. at 28–29. Indeed it is undisputed that a booth performer who fails to appear for her booking will lose her revenues from her first day of work. Wexler Dep. at 26. As Show World's visual telephonic communicators are unable to hire their own replacements, they lack control, and therefore this factor favors the finding of employee status.

## 5. Hiring, Supervising and Paying Assistant

■ When the person for whom the services are performed hires, supervises, and pays assistants, the person is more likely to be exercising control in an employer-employee relationship than in an independent contractor relationship. Rev.Ruling 87–41. As

there are no assistants hired by either the plaintiff or the performers, this factor is inapplicable in this instance.

## 6. Continuing Relationship

■ A continuing relationship between an individual and the person for whom the services are rendered is indicative of an employer-employee relationship. Rev.Ruling 87–41. The Government concedes that the evidence indicates that booth performers typically work for a single establishment for a short period of time and will work for several operators in a given period of time. The record details that the job of visual telephonic communicator is impermanent and would thus ordinarily weigh in favor of finding independent contractor status.

## 7. Hours of Work

Establishing hours of work is a factor indicating control. Rev.Ruling 87–41. Show World allows its performers to choose between one of two time periods, day and evening. Wexler Dep. at 19, 29. Once the performer begins a shift, she must work throughout the entire shift and must remain on the premises in order to receive compensation. Once the choice was made as to time of shift, day or evening, the performer could not alter the shift, start time or finish time. Id. at 29. If the performer did not appear for her shift, the performer lost the security deposit. Id. at 26. Show World's control over the hours of work performed by their visual telephonic communicators favors employee status over that of independent contractor.

## 8. Full–Time

■ If a worker must devote substantially full time to the business of the person for whom services are performed, such worker is more likely to be an employee than an independent contractor. Rev.Ruling 87–41. The evidence is clear that Show World's visual telephonic communicators do not perform on a full time basis. This factor weighs in favor of independent contractor status.

## 9. Place of Work

■ Work performed away from the premises generally indicates that the individual is an independent contractor. Rev.Ruling 87–41. It is undisputed that booth performers are required to work on the premises of Show World and are not allowed to leave and return to the premises mid-shift. Plaintiff argues that as the performers are tenants renting space at Show World's premises, the Court should not base its determination upon ownership of the premises in which the booth is located. However, Show World's manager concedes that one booth is like another. Visual telephonic communicators must perform their work on the premises in the individual booth and may not leave the premises mid-shift if they wish to be compensated. Such facts weigh in favor of employee status.

## 10. Order of Services

Revenue Ruling 87–41 states "the employer has control if the workers are not free to follow their own pattern of work, but must perform the services in the order set by the employer. Often because of the nature of an occupation, the employer does not set the order of services or sets them infrequently; however, if the employer retains the right to set the order of services, that is sufficient to show control." Show World does not choreograph the booth performers' dances, neither does it detail the sequence of a sexual act. Indeed, given the nature of the show performed inside the booth, the very idea of an organized sequence of events is inapposite. What occurs inside the booths is private. If control over the order of services must be placed in the hands of one party, it naturally follows that control rests predominately with the patron and to a lesser extent with the performer.

## 11. Reports

■ The requirement for oral or written reports indicates control by the employer because workers are compelled to account for their actions. Rev.Ruling 87–41. In the case at hand, there is absolutely no evidence that booth performers submitted any type of report; this would be inconsistent with the

latitude and privacy afforded to the performer and to the customer. Monitoring is performed only by audio intervention.

## 12. Method of Payment

Payment by the hour, week or month generally points to an employer-employee relationship. Rev.Ruling 87–41. In the instant case, booth performers work a set shift and are paid 40% of the value of the coins deposited in their booths. Wexler Dep. at 24. In this manner performers are paid a set percentage of the revenues they procure during the agreed upon work period. The payment by a firm of regular amounts (40%) at stated intervals to a worker strongly indicates an employer-employee relationship.

## 13. Business Expenses

If the employer pays the worker's expenses, the worker is ordinarily an employee because the employer needs a certain degree of control in order to regulate spending. Rev.Ruling 87–41. In the instant case, there are very few business expenses related to one-on-one booths. Booth performers purchase their own intimate apparel as well as the props and supplies used during the shows. However, it is apparent that most employees purchase their own clothing, whether it be a pin-striped suit or a waiter's uniform. The bulk of the business expenses incurred in running one-on-one booths (electricity, security, maintenance) are paid by Show World thus lending support to an employer-employee relationship.

## 14. Furnishing Tools and Materials

If an employer furnishes tools and materials, an employer-employee relationship tends to exist. Rev.Ruling 87–41. As discussed *supra*, the visual telephonic communicators purchase their own lingerie and sexual paraphernalia. As these items cannot be shared, it is essential that each performer furnish the props she will utilize. The items that do not implicate hygiene, the telephonic equipment, the coins, and the booth, are furnished by Show World. This criteria neither advances nor weakens the classification of booth performers as employees.

## 15. Investment

Investment in facilities that are used by the worker in the performance of services tends to indicate that the worker is an independent contractor. Rev.Ruling 87–41. As discussed previously, performers invest in costumes and tools, Show World invests in the maintenance of its facilities. As the Fifth Circuit held in *Reich v. Circle C Investments, Inc.,* 998 F.2d 324 (5th Cir.1993), "a dancer's investment in costumes ... is relatively minor to the considerable investment Circle C has in operating the night club." In the case at hand, Show World maintains the facilities, renovates when necessary, and advertises. It is therefore evident that performers invest where it is necessary for hygiene; beyond that, investment in facilities is the duty of Show World. This factor, therefore, weighs in favor of employee status.

## 16. Realization of Profit or Loss

Persons who can realize a profit or loss as a result of their services are generally independent contractors, while persons who cannot do so are employees. Rev.Ruling 87–41. The booth performer has very little financial down-side. When Show World agrees with a performer that she will appear in a booth, no agreement is signed and no money changes hands. Wexler Dep. at 19. An agreement is signed only *after* the performer has worked his or her shift and only after the coin proceeds are divided 60%/40%. If the booth performer does not attract a single customer during her shift, she is not liable for any payment to Show World. On any given shift, the worst she could do would be to earn no money. Thus she runs no risk of loss. For every dollar she earns, 60 cents is paid to Show World. If she fails to appear during a specified shift, her penalty is forfeiture of her security deposit or first day's revenue (40%). Therefore, the visual telephonic communicator never operates at a loss. Take-home pay may total zero, but it will never be lower than zero.

Show World contends that its profit motive is disparate from that of the visual telephonic communicator. Show World prefers the customer to remain in the booths for extended periods of time; the more time the customer

spends in the booth, the more coins from which Show World may garner its 60%. Show World asserts that the performers are more concerned with maximizing their income through private shows, often preferring smaller fee acts and greater turnover to those patrons wishing to remain in the booths for a protracted and more difficult performance. Booth performers may derive more income by acting with flair or anticipating the special needs of an individual customer. As the visual telephonic communicator has a limited ability to realize profit and has almost no financial down-side, this factor favors employee status.

### 17. Working for More than One Firm at a Time

Persons who work for more than one firm at a time are generally independent contractors. Rev.Ruling 87–41. The record indicates that visual telephonic communicators are free to work at other adult entertainment operations and do in fact work in other locations. This factor favors a finding of independent contractor.

### 18. Availability of Services to the General Public

Workers who make their services available to the general public are more likely to be independent contractors. Rev.Ruling 87–41. It is apparent that booth performers make their services available to the general public in the same manner that hair stylists make their services available to the public. *See* Rev.Rule. 70–488 1970–2 CB 219; Rev.Rul. 73–591 1973–2 CB 337. A paying customer walking in from the street may enter Show World to watch a sexually provocative dance or may enter the corner salon to have a haircut. To date, Show World has not allowed booth performers to run their own advertisements. However, performers may contact previous customers via telephone to inform them that they will be appearing at Show World on a certain date. It is therefore clear that this factor neither suggests nor negates employee status.

### 19. Right to Discharge the Worker

The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. Rev.Ruling 87–41. Show World is under no obligation to allow a visual telephonic communicator to perform in a booth and would in fact prohibit the performer from using a booth if that worker had previously engaged in any type of drug or prostitution transaction in the booth. Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and in Opposition to the Government's Cross–Motion for Summary Judgment at 50. Show World has control over whom it permits in its booths. It therefore has the power to discharge any worker who does not follow its guidelines.

### 20. Right to Quit

An employee has the right to end his or her relationship with an employer at any time without incurring liability. On the other hand, an independent contractor agrees to complete a specific job and is responsible for its satisfactory completion, or is legally obligated to make good for failure to complete the job. Rev.Ruling 87–41. A booth performer who does not appear for her shift loses a security deposit equal to 40% of the first days wages. Visual telephonic communicators are not held responsible for the satisfactory completion of their performances. Neither are they legally obligated to make good for failure to complete the shift. The worker's freedom to leave, without incurring liability beyond the 40%, manifests the performers' right to quit and thus weighs in favor of employee status.

We are unpersuaded by Show World's contention that its booth performers are tenants and/or independent contractors who sign leases to rent out booth space and utilize the booth to conduct their own independent businesses. The foregoing analysis of the twenty common law factors, demonstrates that, as a matter of law, visual telephonic communicators are properly classified as employees for employment tax purposes. *See Mladinich v. U.S.*, 379 F.Supp. 117 (S.D.Miss.1974) (hold-

ing go-go dancers as employees for employment tax purposes).

A closer analysis of the specific arguments raised by Show World lends support to the conclusion reached by means of the twenty factor analysis.

### 1. Performer as Tenant

■ First, a lease executed only after the first day of use is not indicative of a classic lease. This is especially true in the case where the lease term is usually no more than a couple of days. It seems more likely that the lease is merely a scheduling device, used in the same manner as a weekly restaurant work schedule that allows the waiters and waitresses (traditionally treated as employees) to request the nights they wish to work. Second, the variable rent provision is atypical when compared with a standard lease. Although percentage leases are utilized with respect to some real estate transactions, *e.g.* retail leases, most leases specify a particular base rental price rather than only a variable fee. Landlords customarily try to protect themselves from the risk, inherent in operating a personal business, of little or no profit. In contrast to this customary practice, Show World structures its agreements so as to make itself even more vulnerable to the downside. Indeed it seems as if Show World is shifting the risk of poor business from its booth performers to itself. This assumption of the risk of loss is more often associated with an employer in an employer-employee relationship than a landlord in a landlord-tenant relationship. Similarly, the notion of withholding 40% of revenues as a security deposit is also not typical of the landlord-tenant relationship.

### 2. Performer as Independent Contractor

Turning now to address Show World's contention that its booth performers are independent contractors, the Court is equally unpersuaded by Show World's claims. As discussed *supra* in the tenancy context, the retention by Show World of 60% of revenues received for time spent in the booth by the patron, and the Show World-performer risk-of-loss allocation, is more usual with respect to employees than to independent contractors. Furthermore, as to the monies not retained, we conclude that the 40% coin money is akin to wages and the 100% cash money is akin to a tip. On its most basic level, a tip is a payment made by a person who has received a personal service. *Roberts v. Commissioner*, 176 F.2d 221 (9th Cir. 1949). Like the waiter who is paid a salary and receives tips, it is the Court's understanding that the booth performer is paid a salary of 40% of the coin deposits and receives a tip of the cash for her personal performance. Indeed, Exhibit 6 in Show World's Notice of Motion details one performer's understanding of the personal performance money to constitute a tip.[5]

The analogy between booth performer and waiter can be further extended. As the waiter primarily relies on his tips as his main source of income, so too may the booth performer rely on her tips as her main source of income. As the amount of the waiter's tip depends upon the skill and efficiency of his performance so too does the booth performer's tip depend on her innate attributes and ability to perform the act desired.

■ In determining whether a worker is an employee or an independent contractor, the power to control the work is of paramount importance. *Frankel v. Bally, Inc.*, 987 F.2d 86 (2d Cir.1993); *Diaz v. U.S.*, 1990 WL 61960, at *3 (C.D.Cal.1990); *In re Compass Marine Corp.*, 146 B.R. 138 (Bankr. E.D.Pa.1992). Show World exercises substantial control over its booth performers by preventing the performers from leaving the

---

**5.** Exhibit 6 reads,
 "Hello!
 Fantasy Booth Guidelines and Tips:
 Tokens are $2.00 a piece + last 1 minute each.
 (3 minutes—$6.00, 5 minutes—$10.00 etc.)
 * * * * * *
 My income is *Your tip!* (emphasis in original)
 I want to excite you, a Good Tip excites me!
 Dildo Show—$20.00

 Masturbation Show—$10.00
 Anal Dildo Show—$30.00—for some reason
 these are more difficult!
 Please enjoy yourself + come again + again!
 Love always,
 Susie
 P.S. Please tip in advance so I'll know what you want!

362

premises during their shifts and preventing the use of alcohol. In order to ensure that its regulations are being followed, Show World periodically monitors the one-on-one booths by audio devices.

Show World maintains that this high degree of control is necessary in order to prevent a violation of prostitution and narcotics laws. For the purpose of employment tax assessment, however, the critical point is not the motivation for the control, but rather the fact that control is exercised.

Once inside the booths, it may seem, upon first glance, as if the fantasy booth performers control the work by negotiating prices and performing in private. However, it must be remembered that Show World's product is adult entertainment. The only way to put forth the product is by the use of the human figure. The presence of the individual is essential for the distribution of the product.

One of the distinguishing characteristics of the services that booth performers provide is that the particular fantasy is narrowly tailored to the individual customer's needs and preferences. In this respect it may be likened to the services provided by a home health care provider who tailors her routine to the needs of the patient. Similarly, it may be likened to the stage dancer at an adult club who structures her routine so as to please the specific audience. Despite the individuality exercised in the performance of these services, for the purposes of employment taxes, both the home health care provider and the stage dancer are employees. TAM 8749001, 2–10–87; *Jeffcoat v. Alaska,* 732 P.2d 1073 (S.Ct.Alaska 1987). Thus, the independent nature of the booth performer's work is not dispositive of independent contractor classification.

The foregoing analysis leads to the conclusion that the relationship between the taxpayer and the performer is a unique one, deliberately structured with a view towards the avoidance of the appearance of an employer-employee relationship. Such avoidance would be valid and permissible if, in fact, the preponderance of relevant factors showed that the true nature of the respective roles of Show World and its performers was as the taxpayer contends. But as our analysis of the twenty relevant factors has shown, the scales tilt decidedly in favor of an employer-employee relationship. Show World has not sustained its burden of proving that the Commissioner's determination of employee status is erroneous.

No material facts are in dispute and so summary judgment is appropriate. The Court denies plaintiff's motion for summary judgment and grants the Government's motion for summary judgment.

SO ORDERED.