**Lora HARRELL, Plaintiff,**

v.

**DIAMOND A ENTERTAINMENT, INC., Defendant.**

**No. 96–137–CIV–FTM–24(D).**

United States District Court,
M.D. Florida.

Nov. 28, 1997.

Douglas L. Wilson, Wilson Law Firm, Naples, FL, for Lora Harrell, plaintiff.

Lawrence G. Walters, Doran, Walters, Rost & Wolfe, Daytona Beach, FL, Bradley J. Shafer, Law office of Bradley J. Shafer, Lansing, MI, for Diamond A Entertainment, Inc., defendant.

## ORDER

BUCKLEW, District Judge.

This cause comes before the Court for consideration of Defendant's Motions for Partial Summary Judgment (Doc. Nos. 37 and 37A, filed July 21, 1997). Plaintiff filed a response on October 6, 1997 (Doc. No. 59).

Plaintiff Lora Harrell commenced this action on April 17, 1996 (Doc. No. 1), alleging that Defendant Diamond A failed to pay her a minimum wage in violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (the "FLSA").[1] From December, 1993, to April, 1995, Ms. Harrell worked as an exotic dancer at two Fort Myers nightclubs ("Babe's" and "Foxy Lady") which were operated by Diamond A. The questions presented are whether an exotic dancer is an "employee" entitled to protection under the FLSA, and whether an exotic dancer is a "professional" within the meaning of certain exemptions to the FLSA.

## I. FACTS

The basic facts are simple and not in dispute.[2] Following a short stint as a waitress,[3]

---

1. The Court does not address here Plaintiff's claims for sexual harassment and retaliation (Counts II and III, respectively), or Defendant's Motion for Partial Summary Judgment of Title VII Claims (Doc. No. 35, filed July 21, 1997). On September 22, 1997, Plaintiff moved to amend her complaint to remove Counts II and III, effectively withdrawing these claims and rendering Defendant's motion for summary judgment as to these claims moot.

2. Unless otherwise indicated, the following facts are taken from the "Statement of Facts" section in Defendant's Brief (Doc. No. 37B), pp. 3–5. Plaintiff did not specifically contest any of the facts that are recited above; instead, Plaintiff took issue with Defendant's "characterizations" and "perjorative assertions." Plaintiff's Response (Doc. No. 59), p. 7.

3. Plaintiff started working as a waitress in October 1993. While a waitress, Plaintiff was paid at a rate of one-half the minimum wage plus tips.

Plaintiff "tried out" for a position as an exotic dancer at Babe's. Plaintiff began dancing at Babe's in December, 1993. As a dancer, Plaintiff's sole source of income was the tips (or "dance fees") she extracted from customers for the performance of "stage dances" and "table dances." A "stage dance," as the term implies, is a dance performed on a raised platform for the customers at large. A "table dance" is dance performed off-stage in a relatively smaller space (such as the space immediately in front of a seated customer, or on a couch or tabletop) for one paying customer. In general, a customer paid a "set fee" (or $5 or $10) for a table dance.

The relationship between a dancer and a Diamond A club was structured as a licensing arrangement. The dancer and Diamond A enter into a "License to Use Business Premises" (*see* Exh. A to Doc. No. 37B), which grants the dancer a nonexclusive license to dance and entertain customers at certain specified nightclubs. In exchange for the license, the dancer pays the club a licensing fee (called "shift pay") of $10.00 per day shift and $15.00 per night shift.[4] The dancer retains all tips (or "dance fees") that she receives from customers for stage dances and table dances; she does not report (or otherwise account for) any of her earnings to the club; and the club does not pay the dancer any wages or other form of stipend.[5]

As a dancer, Plaintiff made approximately $125 to $150 per eight-hour shift. *See* Harrell Deposition (Exh. B to Doc. No. 37B). Defendant danced at Diamond A clubs until April 1, 1995, when her license was terminated.[6]

Plaintiff does not claim that Defendant violated the FLSA with respect to her employment as a waitress.

4. In addition to shift pay, it appears that each dancer was expected to tip the disc jockey an amount equal to 10% of her earnings. Harrell Deposition (Exh. B to Doc. No. 37B), pp. 88, 106.

5. In addition to dancing at the club, a dancer could also dance at certain bachelor or birthday party functions (a task referred to as a "go-go gram"). Although it appears that the club participated to some degree (*e.g.*, coordinating the event, sending a bouncer, *etc.*) in "go-go grams,"

## II. DISCUSSION

Defendant argues that Plaintiff is not an "employee" entitled to the protection of the FLSA because she was engaged, at all times material to her claim, as an independent contractor. Even assuming Plaintiff was an "employee," Defendant argues she was a "professional" within the meaning of the § 213 exemption from the FLSA. Defendant also argues that exotic dancers like Plaintiff are not in the category of persons that Congress intended to protect, and that Plaintiff is estopped from raising an FLSA claim because she failed to raise during her employment and failed to prepare and file the appropriate tax returns and reports.

### A. Summary Judgment Standard

The Eleventh Circuit discussed the standard for granting summary judgment in *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (1993), *reh'g and reh'g en banc denied*, 16 F.3d 1233 (11th Cir.1994):

> Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

*Hairston*, 9 F.3d at 918. The Eleventh Circuit recognized the seminal case concerning summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91

it is not clear whether the same arrangement (with respect to tips) applied. *See e.g.*, Clark Deposition (Exh. E to Doc. No. 37B), p. 40; Karter Deposition (Exh. D to Doc. No. 37B), pp. 10–12.

6. The parties dispute the reasons for the termination. Plaintiff maintains that she was fired in retaliation for her complaints of sexual harassment. *See* Complaint (Doc. No. 1), ¶ 16; *see also* Plaintiff's Response, p. 7 n. 9. Defendant maintains that the licensing agreement was terminated because of certain illegal acts she allegedly performed during a go-go gram. *See* Defendant's Brief (Doc. No. 37B), p. 5.

L.Ed.2d 265 (1986), by highlighting the following passage:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Id.* at 918. In conclusion, the Eleventh Circuit outlined the parties' respective burdens and the ruling court's responsibilities:

> The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy,* 816 F.Supp. 1553, 1556 (N.D.Ga. 1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. *Welch v. Celotex,* 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[,] 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).
>
> Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. The Court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S .Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed in his favor." *Id.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).

*Id.* at 918–19. *See Mulhall v. Advance Sec. Inc.,* 19 F.3d 586, 589–90 (11th Cir.1994); *Howard v. BP Oil Co.,* 32 F.3d 520, 523–24 (11th Cir.1994).

**B. Employer/Employee Relationship.**

Exotically structured working arrangements are a common feature in the adult entertainment industry. *See; e.g.; 303 West 42nd Street Enterprises, Inc. v. Internal Revenue Service,* 916 F.Supp. 349 (S.D.N.Y. 1996) (tax case in which club characterized nude performers as "tenants" leasing space in peek-a-boo booths); *Club Hubba Hubba v. United States,* 239 F.Supp. 324 (D.Haw.1965) (tax case in which club characterized imported troupe of Japanese dancers as independent contractors). Arrangements factually similar to the one in this case have been tested by federal courts in Texas, Indiana and Colorado. *See Reich v. Circle C. Investments, Inc.,* 998 F.2d 324 (5th Cir.1993) (whether dancer was "employee" under FLSA); *Reich v. ABC/York–Estes Corp.,* 1997 WL 264379 (N.D.Ill.1997) (whether dance fees were "tips" under FLSA); *Reich v. Priba Corp.,* 890 F.Supp. 586 (N.D.Tex. 1995) (whether dancer was "employee" under FLSA); *Reich v. ABC/York–Estes Corp.,* 157 F.R.D. 668 (N.D.Ill.1994) (whether dance fees were "tips" under FLSA), *rev'd on other*

*grounds,* 64 F.3d 316 (7th Cir.1995); *Martin v. Priba Corp.,* 1992 WL 486911 (N.D.Tex.) (whether dancer was "employee" under FLSA); *Martin v. Circle C Investments, Inc.,* 1991 WL 338239 (W.D.Tex.); *Donovan v. Tavern Talent & Placements, Inc.,* 1986 WL 32746 (D.Colo.) (whether "tips" could be used to offset completely the minimum wage requirement). Without exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage. To our knowledge, no court in the Eleventh Circuit has ever addressed the issue.

■ Under the FLSA, employment is defined with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992) (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1947)). An entity is said to "employ" a person if it "suffers or permits" the person to work. 29 U.S.C. § 203(g). The "suffer or permit to work" standard derives from state child-labor laws and has been called "the broadest definition [of employee] that has ever been included in one act." *Antenor v. D & S Farms,* 88 F.3d 925, 929 n. 5 (11th Cir.1996) (citing *Rutherford Food Corp.,* 331 U.S. at 728 n. 7, 67 S.Ct. at 1476 n. 7, and quoting *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 297 n. 3, 89 L.Ed. 301 (1945)). Courts look not to the common law definition of employment, but rather to the "economic reality" of whether the putative employee is economically dependent upon the alleged employer. *See Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. at 1477; *Aimable v. Long & Scott Farms,* 20 F.3d 434 (11th Cir.1994).

■ In assessing economic dependence, the Court will consider six factors: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business. *Real v. Driscoll*

*Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir.1979) (citing *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947; *United States v. Silk,* 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947); and *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477); *see Donovan v. Tehco,* 642 F.2d 141, 143 (5th Cir.1981) (applying the first five factors); *see also* 29 C.F.R. § 500.20(h)(4) (regulations under the Migrant and Seasonal Agricultural Protection Act rely on *Real* for a definition of employment and enumerate the same six factors). In addition, Defendant asks the Court to consider five other factors.

■ In considering these factors, the Court is reminded that the "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Antenor,* 88 F.3d at 930 (quoting *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477). These factors are used because they are "indicators of economic dependence.... [T]he weight of each factor depends on the light it sheds on the [alleged employee's] dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." *Id.* at 931–32 (citing *Aimable,* 20 F.3d at 439–40).

**(i) control**

■ Defendant argues that an assessment of control cuts in its favor because the dancers appearing in its clubs exercised complete control over many aspects of their performances. Diamond A dancers scheduled their own appearances by penning in their names on a blank schedule sheet. *See* Tracey Affidavit (Exh. F to Doc. No. 37B), ¶ A. Each dancer was free to dance (or not to dance) with a particular customer, as she so choose, and there was no established minimum or maximum number of dances that Defendant required. *Id.,* ¶ H; Harrell Deposition, pp. 230–31. On one occasion, Plaintiff chose not to pass out "free complimentary dance" cards, and refused to honor free dance cards that other dancers passed out. *See* Harrell Deposition, pp. 162–63. On one occasion, Plaintiff refused management's request that she perform at another club ("Fantasy"). *Id.,* pp. 181–84. Diamond A did not provide

Plaintiff with any dance instruction or training, and did not place any restrictions on her costumes (other than compliance with the law), hairstyles or make-up. *Id.*, pp. 51–52, 173–74, 244–45, 275–76, 283; Tracey Affidavit, ¶ I. Musical selections were likewise left within a dancer's discretion, and Plaintiff often brought in her own country western music. Harrell Deposition, pp. 56–57.[7] Diamond A did not require its dancers to fill out written reports or to otherwise keep track of how many dances each performed or how much money each received from the customers. Harrell Deposition, pp. 110–11, 230–31. Indeed, it seems fairly obvious that Diamond A would have no way of knowing how much money each of its dancers charged for dances and how much each took home at the end of a shift.

■ The mere fact that Diamond A has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors. Indeed, one could say that the nature of a dancer's job requires some measure of discretion and flexibility.[8] The question this Court must resolve is whether a Diamond A dancer's freedom to work when she wants and for whomever she wants reflects economic independence, or whether these freedoms merely mask the economic reality of dependence. *See Priba Corp.*, 1992 WL 486911 at *3 (citing *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 301–02 (5th Cir.1975)). "An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties

under the F.L.S.A., by granting [her] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate." *Mednick*, 508 F.2d at 302. The real question is whether the dancer exerts control over a "meaningful" part of the business:

> [T]he real touchstone is the reality of the employment relationship. An entertainer at Cabaret Royale is completely dependent on the club for her earnings. The club controls all advertising, without which the entertainers could not survive. Moreover, the defendants created and control the atmosphere and surroundings at the Cabaret Royale, the existence of which dictates the flow of customers into the club. An entertainer can be considered an independent contractor only if she "exerts such control over a meaningful part of the business that she stands as a separate economic entity." In this case, the entertainer's economic status is inextricably linked to those conditions over which defendants have complete control.

*Priba Corp.*, 890 F.Supp. at 592.

In the present case, several facts suggest that Diamond A exercised considerable control over its dancers. The club established a set fee for table dances, and the disc jockey announced this fee on a regular basis. Harrell Deposition, p. 223. Each dancer was obligated to perform on center stage during

---

**7.** Given the structure of her routine and the presence of other dancers, the Court assumes Plaintiff's musical selections were played only during the stage dances she performed.

**8.** For example, in *303 West 42nd Street Enterprises, Inc.*, 916 F.Supp. 349, the Southern District of New York found that certain "fantasy booth" performers were employees (rather than independent contractors), notwithstanding the freedom a performer had to strike her own deals with her customers:

> Once inside the booth, it may seem, upon first glance, as if fantasy booth performers control the work by negotiating prices and performing in private. However, it must be remembered that Show World's product is adult entertainment. The only way to put

forth the product is by the use of the human figure. The presence of the individual is essential for the distribution of the product.

> One of the distinguishing characteristics of the services that booth performers provide is that the particular fantasy is narrowly tailored to the individual customer's needs and preferences. In this respect it may be likened to the services provided by a home health care provider who tailors her routine to the needs of the patient. Similarly, it may be likened to the stage dancer at an adult club who structures her routine so as to please the specific audience. Despite the individuality exercised in her performance of these services, for the purposes of employment taxes, both the health care provider and the stage dancer are employees.

*Id.* at 362 (citations omitted).

her "stage rotation." Tracey Affidavit, ¶ J.[9] Dancers could not wear flats. Harrell Deposition, p. 244. And the club employed "bouncers" to protect the dancers in case a customer "got out of hand." *See* Clark Deposition (Exh. E to Doc. No. 37B), p. 40; Harrell Deposition, p. 131. It is also apparent that the dancers had no control over the customer volume or the atmosphere at each of the nightclubs. *See, e.g.,* Harrell Deposition, pp. 107–10 (describing difference between crowd at Babe's and crowd at Foxy Lady). At the same time, all dancers were required to abide by written rules and regulations which were incorporated by reference in the license agreement. *See* Rules & Regulations (Exh. A to Doc. No. 37B); *see also Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1312 (5th Cir.1976) (review of lease conditions indicative of control). These included: (i) fines for unexcused absences, tardiness, and intoxication, *see also* Harrell Deposition, p. 87; *Circle C. Investments, Inc.,* 998 F.2d at 327 (scheduling fines indicative of control); (ii) a rule requiring the dancer to leave the club as soon as her shift was over and to not frequent the club as a patron or as a guest of a customer; (iii) a rule requiring the dancer to perform "for all patrons of the club, not one or two"; (iv) a rule requiring the dancer to inform the disc jockey of her musical preferences in advance and to not complain about the music once her performance began; and (v) a rule requiring the dancer to not permit any customer to touch her "private parts," and to act courteously and "professional" to all customers.

These facts overshadow the smaller freedoms that Diamond A allowed its dancers. On the record before it, the Court cannot say that Plaintiff exerted such control over a "meaningful part" of the business that she stood "as a separate economic entity" from Diamond A. This factor therefore cuts in favor of economic dependence.

### (ii) relative investments

■ Defendant argues that Plaintiff made sizeable expenditures on her own account in order to dance. These include approximately $1,000 in costumes (during the first six months), $130 per month for hairstyling, $100 per month for make-up, and $65 per month for shoes. Harrell Deposition, p. 275–80. Defendant fails to mention, however, any of the undoubtedly material expenditures (for advertising, facilities, maintenance, etc.) made by Diamond A. The courts which have addressed this factor have universally concluded that a dancer's investment is minor when compared to the club's investment. *See, e.g., Circle C. Investments, Inc.,* 998 F.2d at 328 ("A dancer's investment in costumes and a padlock is relatively minor to the considerable investment Circle C has in operating a nightclub" and the nightclub's investment is "obvious"); *Priba Corp.,* 890 F.Supp. at 593 (entertainers make no investment aside from choosing what clothing to wear, and "but for defendants' provision of the lavish work environment, the entertainers at the club likely would earn nothing"). This factor therefore cuts in favor of economic dependence.

### (iii) skill and initiative

Defendant argues that Plaintiff's income was solely and completely dependant upon her initiative. Plaintiff performed "rounds" to obtain tips and to solicit table dances (an activity called "hustling" in the industry). The club did not funnel customers to Plaintiff; she had to go and get them. *See, e.g.,* Harrell Deposition, p. 163; *but see id.,* pp. 287–88 (Harrell claims customers usually approached her and asked her for table dances during her rounds).

The "hustling" argument has been universally rejected by every court to consider it. The reason was best articulated by the Northern District of Texas:

> The ability to converse with club clientele in an effort to generate a larger tip is not the type of initiative contemplated [by this factor]. Customer rapport 'much more closely parallels "efficiency" than initiative.... [I]nitiative, not efficiency, is the standard for economic dependence.'

---

**9.** *The term "stage rotation" refers to a dancer's schedule of stage dances vis a vis all other on-duty dancers, during her shift. It is not clear* from the record how (or by whom) a dancer's rotation was determined.

The entertainers at Cabaret Royale do not have the opportunity to exercise the skill and initiative necessary to elevate their status to that of independent contractors. Defendants argue that what a particular entertainer earns in tips is directly related to that entertainer's initiative and skill in performing. This argument, however, is true in any employment relationship: an individual can always improve her chances for greater earnings by using initiative and skill to perform to the best of her ability. [The Fifth Circuit] accordingly considered initiative, not in the sense of performing well, but in the sense of engaging in those activities that tended to expand the sale's representative's client base, goodwill, and contracting possibilities. An entertainer at the [nightclub] owns no enterprise. The scope of her initiative is restricted to decisions involving what clothes to wear or how provocatively to dance. Such limited initiative is more consistent with the status of an employee than an independent contractor.

*Priba Corp.*, 890 F.Supp. at 593 (citations omitted); *see also Circle C Investments, Inc.*, 998 F.2d at 328 ("ability to develop and maintain rapport with customers is not the type of 'initiative' contemplated by this factor.... The dancers do not exhibit the skill or initiative indicative of persons in business for themselves"); *Priba Corp.*, 1992 WL 486911 at \*4 (rejecting hustling argument because a dancer "owns no enterprise. The scope of her initiative is restricted to decisions involving what clothes to wear or how provocatively to dance.").

■ This Court agrees with the Northern District of Texas. "Hustling" is not the kind of initiative contemplated by this factor. In the instant case, it is apparent that a Diamond A dancer exercises no control over customer volume or club atmosphere. *See, e.g.*, Harrell Deposition, pp. 107–10. There is no evidence that an individual dancer actively participates in any effort to increase client base, to enhance goodwill, or establish contracting possibilities.[10] She owns no enterprise, and the scope of her initiative is re-

stricted to decisions involving what clothes to wear or how provocatively to dance.

Defendant's argument regarding skill is equally uncompelling. Defendant argues that a skill requirement is evidenced by the fact that dancers have to "try out" for a position with Diamond A. Defendant has not presented, however, any criteria or standards for the try out or for dancing skill in general. Defendant itself points out that Plaintiff did not have prior dancing experience before entering into the license agreement with Diamond A; indeed, before dancing she was a waitress. *See Priba Corp.*, 890 F.Supp. at 592 (dancers testified they had no prior experience and no club requirement supported finding that special skills were a requirement). There were no dance seminars, no instruction booklets, and no choreography whatsoever. Harrell Deposition, pp. 53, 244. No specific dance steps were encouraged or required; the only requirement was that the dancer "had to be moving." *Id.*, p. 244. According to Plaintiff, the dancers who failed the try out were "few and far between." *Id.*, p. 282. Thus, the Court is not persuaded that the job required a special or unusual skill.

Based on the foregoing, the Court is not persuaded that a Diamond A dancer practiced the kind of initiative and skill that sets her apart as an independent contractor. This factor cuts in favor of dependence.

**(iv) opportunity for profit and loss**

■ Defendant argues that Plaintiff's opportunity for loss and/or profit is directly related to her "hustling" efforts. However, the opportunity for profit and loss has more to do with relative investments, with control over larger aspects of the business, and with like forms of initiative. *See Circle C Investments, Inc.*, 998 F.2d at 328 (given club's role in drawing customers through advertising, location, business hours, maintenance of facilities, aesthetics, inventory of food and beverages,—the club's "control over determinants of customer volume"—the club exercises a high degree of control over a dancer's opportunity for profit); *Priba Corp.*, 890 F.Supp.

---

**10.** Indeed, one of the reasons Defendant asserts Plaintiff was let go is that she represented at a go-go gram that she was there on behalf of Foxy Lady. *See* Defendant's Brief (Doc. No. 37B), p. 5.

at 593 (entertainer's risk is limited to "tip out" fee while nightclub "shoulders the greatest risk").

Defendant would have us believe that a dancer like Ms. Harrell could hang out her own shingle, pay nothing in overhead,—no advertising, no facilities, no bouncers,—and draw in a constant stream of paying customers. A dancer at Diamond A risks little more than a daily "tip out" fee, the cost of her costumes, and her time. That a dancer may increase her earnings by increased "hustling" matters little. As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

### (v) permanency of the relationship

Defendant did not raise, much less argue, this factor. Plaintiff danced for Diamond A for fourteen months. There is no evidence as to whether Plaintiff's term of engagement was more or less than that of the average Diamond A dancer.

Other courts have found that exotic dancers tend to be itinerant, but have tended to place less emphasis on this factor. *See Circle C Investments, Inc.*, 998 F.2d at 328–29 (finding lack of permanency, but holding other factors on balance outweigh this factor); *Priba Corp.*, 890 F.Supp. at 593 ("Because dancers tend to be itinerant, the court must focus on the nature of their dependence"); *Circle C. Investments, Inc.*, 1991 WL 338239 at *4 (W.D.Tex.) (mere fact that the workers are transitory is "not determinative" because the employees are not "in business for themselves"). This Court agrees, and places little emphasis on this factor.

### (vi) integral part

■ The extent to which the task performed by the alleged employee was integral to the business of the employer is a factor indicating dependence. *Aimable*, 20 F.3d at 444 (citing *Rutherford*, 331 U.S. at 730, 67

S.Ct. at 1477); *Antenor*, 88 F.3d at 925 (same); *see also 303 West 42nd Street Enterprises, Inc.*, 916 F.Supp. at 357 ("When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the worker who performs those services is more likely to be considered an employee than an independent contractor"). Exotic dancers are obviously essential to the success of a topless nightclub. *See, e.g., Circle C. Investments, Inc.*, 1991 WL 338239 at *4 (W.D.Tex.) (unlike shoe shine boys at an airport, topless dancers are the "main attraction" at a topless nightclub and "obviously very important" to the business of the nightclub). Although neither party has presented evidence regarding the number of dancers or the amount of business revenues dependent on dancing,[11] the Court thinks it obvious that the continued success of Diamond A depends to an appreciable degree upon its provision of stage and table dances. That dancers play such an integral role is highly indicative of their economic dependence.

### (vii) other factors

Defendant asks the Court to consider five additional factors: (1) the extent to which the putative employer determined the rate and method of payment, (2) the extent to which the putative employer maintained employment records, (3) the intent of the parties, (4) the way in which the parties characterize themselves for tax purposes, and (5) the extent to which the putative employer provided employment benefits.

The first two factors (the power to determine the rate and method of wages and the maintenance of employment records) are drawn from *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Defendant argues that because Diamond A has never paid its dancers any wages, because it has never kept track of how many dances each dancer performs, how much she charges, or how much she earns, Diamond A cannot be said to control the rate

---

**11.** Plaintiff has alleged that Diamond A engaged approximately 80 dancers at each of the three nightclubs (Babe's, Foxy Lady, and Fantasy) that

it operated, *see* Complaint (Doc. No. 1), ¶ 5; neither party, however, has submitted evidence to support or contest this allegation.

or method of payment, much less maintain any written employment records.

■ These factors, however, are more indicative of joint employment status, and add little to a determination of employee status.[12] Many employees are compensated on the basis of monies received directly from their employer's customers and their receipt of payment in this way in no way detracts from the fact that they are still economically dependant on their employers. In *Mednick*, for example, the Fifth Circuit held that a cardroom attendant was an "employee" of a hotel even though he worked with the understanding that the tips he collected from the cardroom patrons would be his sole source of income. *Mednick*, 508 F.2d 297, 300–02.

Even if the method and rate of payment were relevant factors, the Court finds Defendant's characterization of the facts somewhat disingenuous. The club established a set fee for dances, and the disc jockey announced this fee on a regular basis. *See* Harrell Deposition, p. 223. Moreover, the method of payment was obviously cash, inasmuch as the dancers were not likely able to accept alternative means of payment (i.e., credit cards) absent the assistance of the club. In short, these facts suggest that the economic reality is one of dependence.

■ Defendant's third additional factor (the intent of the parties) is likewise unavailing. "In deciding whether an individual is an 'employee' within the meaning of the FLSA, the label attached to the relationship is dispositive only to the degree that it mirrors the economic reality of the relationship. 'Where the work done, in its essence, follows the usual path of an employee, putting on an "independent contractor" label does not take the worker from the protection of the Act.'" *Tehco*, 642 F.2d at 143 (citations omitted). The fact that a licensing agreement created by Diamond A contains a boilerplate 'independent contractor' provision does little to evidence Plaintiff's intent to be treated as an independent contractor.

■ Defendant's fourth and fifth additional factors (characterization for tax purposes and the provision of employee benefits) are not relevant. Defendant cites no case which considers these factors in the context of the broad "suffer or permit to work" definition of employment contained in the FLSA. Indeed, the case upon which Defendant relies, *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 752, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), turns on the much narrower common law definition of employment; a definition which was subsequently found not applicable to the FLSA in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992) (citing *Rutherford Food Corp.*, 331 U.S. at 728, 67 S.Ct. at 1475).

### (viii) consideration of all factors

When the Court considers the preceding factors collectively and qualitatively, it cannot say as a matter of economic reality that

---

12. Many of the cases under the FLSA concern the question of whether a defendant, as between two or more putative employers, is a joint employer of certain workers. For example, the issue before the Ninth Circuit in *Bonnette* was whether certain defendant social service agencies were joint employers of certain plaintiff chore workers who were ostensibly employed by in-home care recipients. *Bonnette*, 704 F.2d at 1467–68. A similar question of joint employment was presented in *Aimable v. Long & Scott Farms*, 20 F.3d 434 (11th Cir.1994).

Naturally, the extent to which a putative joint employer (such as the social service agency in *Bonnette*) controls a chore worker's rate and method of payment, and/or maintains employment records for the chore worker, helps to indicate whether the social service agency, as opposed to the in-home care recipient, is the real employer of the chore worker; that does not mean, however, that the same factors bear any relevance to the question of whether the chore worker is an independent contractor or an employee.

More telling are the regulations promulgated under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801 et seq. (the "MSAWPA"), an act which adopts by reference the definition of "employ" in the FLSA, *see* 29 U.S.C. §§ 1802(5) and 203(g), and which was the subject of analysis in *Aimable*. According to the regulations, whether an independent contractor or employment relationship exists turns on an analysis of the six *Real* factors. *See* 29 C.F.R. § 500.20(h)(4). In contrast, the factors urged by Defendant—the method and rate of payment and the maintenance of employment records,—are factors to be considered in a determination of joint employer status. *See* 29 C.F.R. § 500 .20(h)(5)(iv).

the dancers at Babe's and Foxy Lady were not economically dependent on Diamond A. The totality of the evidence before the Court indicates that Diamond A employed Plaintiff as defined under the FLSA.

## C. Professional Exemption

Defendant next argues that even if Plaintiff is an employee under the FLSA, she is an exempt "professional" within the meaning of § 213. No federal case has ever addressed the question of whether a dancer is an exempt "professional" under the FLSA, much less addressed the specific issue as it relates to exotic dancers.

■■■■■ The minimum wage and overtime provisions of the FLSA do not apply to "any employees employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary [or Labor] . . .)." 29 U.S.C. § 213(a)(1). These exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995) (quoting *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960)). The employer bears the burden of establish-

ing that its employees are exempt professionals. *Id.*

■■■■■ In considering this exemption, the Court is aided by regulations and interpretations issued by the Department of Labor. Regulations promulgated pursuant to an express legislative directive must be given controlling weight. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Agency interpretations, while not conclusive, may be referred to for guidance. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). In this case, the most relevant regulation is Section 541.3 of Title 29, Code of Federal Regulations, the regulation which outlines the definition of a "professional" who works in a recognized field of artistic endeavor. The regulation provides two avenues for exemption: a long test (requiring compliance with subsections (a)—(d)), and a short test (set forth in subsection (e)). *See, e.g., Bohn v. Park City Group, Inc.,* 94 F.3d 1457 (10th Cir.1996); *Freeman v. National Broadcasting Co., Inc.,* 80 F.3d 78 (2nd Cir.1996); *Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060 (1st Cir.1995); *Reich v. Gateway Press, Inc.,* 13 F.3d 685 (3rd Cir.1994); *Dalheim v. KDFW–TV,* 918 F.2d 1220 (5th Cir.1990). Particularly helpful is § 541.302, an agency interpretation which construes § 541.3 and provides several examples of professional status.[13]

---

13. Section 541.302 states, in pertinent part:

(a) The requirements concerning the character of the artistic type of professional work are contained in § 541.3(a)(2). Work of this type is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee.

(b) The work must be "in a recognized field of artistic endeavor." This includes such fields as music, writing, the theater, and plastic and graphic arts.

(c)(1) The work must be original and creative in character, as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training. In the field of music there should be little difficulty in ascertaining the application of the requirement. Musicians, composers, conductors, soloists, all are engaged in original and creative work within the sense of this defini-

tion. In the plastic and graphic arts the requirement is, generally speaking, met by painters who are given the subject matter of their painting. It is similarly met by cartoonists who are merely told the title or underlying concept of a cartoon and then must rely on their own creative powers to express the concept. It would not normally be met by a person who is employed as a copyist, or as an "animator" of motion-picture cartoons, or as a retoucher of photographs since it is not believed that such work is properly described as creative in character.

(2) In the field of writing the distinction is perhaps more difficult to draw. Obviously the requirement is met by essayists or novelists or scenario writers who choose their own subjects and hand in a finished piece of work to their employers (the majority of such persons are, of course, not employees but self-employed). The requirement would also be met, generally speaking, by persons holding the more responsible writing positions in advertising agencies.

**(i) short test**

██ According to § 541.3(e), an employee who is paid $250 or more per week, and "whose primary duty consists of . . . work requiring invention, imagination, or talent in a recognized field of artistic endeavor," shall be deemed a "professional" for purposes of the exemption.

As a threshold question, the Court must ask whether Plaintiff made $250 or more per week. A lower threshold (of $170 per week) is used in the long test. *See* § 541.3(e). Although it is clear that Plaintiff earned between $125–150 per eight-hour shift, Plaintiff argues that none of this money can be used to meet the $250 threshold because it was received from the customers and not the employer. The Court finds some merit to this argument. Section 541.3 requires that the employee be compensated for services "on a salary or fee basis . . . exclusive of room and board." Although nothing in the regulation expressly requires that the compensation come from the employer, the agency interpretation presumes as much. *See, e.g.,* § 541.311. Moreover, a construction of the threshold which requires payment from the employer is consistent with the distinction between service charges and dancer tips drawn in other cases. *See, e.g., Reich v. ABC/York–Estes Corp.,* 1997 WL 264379 (N.D.Ill.) (monies earned by exotic dancers

are tips, not service charges, which cannot be used to offset the employer's obligation to pay a minimum wage); *Donovan v. Tavern Talent & Placements, Inc.,* 1986 WL 32746 (D.Colo.) (same). Consequently, the Court is not prepared to conclude that Plaintiff meets the monetary threshold for the professional exemption, notwithstanding the fact that she received dance fees in excess of $250 per week.

██ Even if Plaintiff had met the compensation threshold, the Court is not convinced that Plaintiff's exotic dancing requires "invention, imagination, or talent." Defendant argues that Plaintiff's dancing meets this requirement (i) because she felt a conscious need to be creative and not copy other dancers, *see* Harrell Deposition, p. 254, and (ii) because dancing is analogous to acting, an occupation that "easily" meets the "invention, imagination, or talent" requirement, *see* § 541.302(d).[14] Defendant supports its argument with a twenty-five page affidavit from Judith Lynne Hanna, Ph.D., an anthropologist who has authored several books and articles on the subject of dance, and who has studied exotic dance at 23 adult entertainment clubs across the country. *See* Hanna Affidavit (Exh. H to Doc. No. 37B), ¶¶ 6, 9. Dr. Hanna has provided a catalogue of some fifty dance steps that make up an exotic dancer's "vocabulary," *see id.,* ¶ 30,[15] and

(d) Another requirement is that the employee be engaged in work "the result of which depends primarily on the invention, imagination, or talent of the employee." This requirement is easily met by a person employed as an actor, or a singer, or a violinist, or a short-story writer. In the case of newspaper employees the distinction here is similar to the distinction observed above in connection with the requirement that the work be "original and creative in character." Obviously the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on "invention, imagining, or talent." On the other hand, this requirement will normally be met by actors, musicians, painters, and other artists.

The Court recognizes that there is a split in the circuits regarding the use of this particular interpretation for the short test inasmuch as the interpretation speaks more directly to the long test. *Compare Freeman v. National Broadcasting Co., Inc.,* 80 F.3d 78 (2nd Cir.1996), *with Reich v. Gateway Press, Inc.,* 13 F.3d 685 (3rd Cir.1994).

However, where, as in this case, portions of § 541.302 are used by a defendant to support (rather than defeat) a finding of exemption under the short test, the Court is not compelled to ignore the § 541.302.

**14.** To be precise, Defendant refers to testimony in which Plaintiff was asked whether she had had any acting experience (including "high school"), to which Plaintiff replied that she had and that she thought exotic dancing required more skill and talent than acting. *See* Harrell Deposition, p. 281. Although the Court does not find Plaintiff's testimony terribly compelling in and of itself, the Court nevertheless finds the analogy persuasive.

**15.** The steps include the strut, the crawl, the pose, the pout, the shimmy up a pole, the pretending to be caged, the gyrating of hips and torso, the snaking of arms upward, the swinging of one leg over the customer's head, and the somersault into a split; they range in complexity from the simple tossing of hair to the "trained bird removes stripper's clothes." Hanna Affidavit, ¶ 30.

submits that creativity in the world of exotic dance is "propelled" by capitalism and the competition among dancers at the club, *see id.*, ¶¶ 16, 34.

Plaintiff's response to Defendant's argument is to reduce exotic dancing to its most basic element, a veiled attempt at unveiling, and to separate this overriding theme from its allegedly incidental dancing component:

> The result, the work product being purchased (as it were) by the employer is not their dancing skill at all. It is the ability of the dancers to titillate male customers. If a fully clothed modern dancer auditioned to modern, atonal music, she might be a former member of the Martha Graham or Twyla Tharp dance groups, but she would not stand a chance of being hired at Babe's or Foxy Lady, the two night clubs in this case. The reason is that they are not looking for dancing talent, they are looking for attractive young women who will bare their bodies as much as the law allows, and can do some semblance of dancing which will gratify the crowd. "Gratify" is obviously a key word for the "table dances," in which the dancer dances close to the patron. There was absolutely no professional dance instruction or direction of any kind....
>
> Because the artistic quality of the dancing was of no interest to the owners, it follows that whatever quality was required in a dancer's performance could be attained by the average patron of a disco or other nightclub where social dancing is permitted.

Plaintiff's Response, pp. 5–6.

The Court acknowledges that a dancer's physical attributes may be more important to Diamond A (or to any given customer) than a dancer's ability to dance, but the Court cannot make the kind of distinction that Plaintiff is requesting.[16]

A measure of appealing simplicity attends Defendant's analogy to acting. Like dance, acting is a performing art. Unlike other fields of art, the individuality, the originality and creativity of a performing artist's work flows not from the message that she presents, *see* § 541.302(c)(1) (cartoonists and "animators"); § 541.302(f) (newspaper reporters and editorial writers), but from the presentation itself. A performer presents someone else's words, someone else's melodies, or someone else's choreography. An actor's skill or talent may range anywhere from that of a regular cast member on "Baywatch" to that of a Shakespearean actor. To be sure, many actors rely more on their physical appearance than on their acting ability; many go so far as to expend sizeable amounts of money for cosmetic surgery. Nevertheless, actors perform work that is, according to § 541.302, "original and creative in character," and that "easily" meets the "invention, imagination, and talent" requirement. § 541.302(d). No distinction is drawn between serious actors and bad actors, no assessment is made of the aesthetic value of their performance or of the message they seek to present. No distinction is drawn between "high brow" and "low brow" art, *see* Hanna Affidavit, ¶ 18, and the language leaves room for Luciano Pavarotti and the Spice Girls, for Laurence Olivier and Arnold Schwarzenegger, for Mikhail Barishnikov and Gypsy Rose Lee.

Nevertheless, a broad construction of § 541.302 does not end the Court's inquiry. The Court cannot rely blindly on the title "dancer" and its attendant analogy to acting anymore than it can make the aesthetic or moral judgment requested by Plaintiff. Instead the Court is forced to resolve the apparent inconsistency between this Court's conclusion (in Section B(iii) above) that dancing at a Diamond A club does not require a specialized skill, and Defendant's point here that all dance, like all acting, easily meets the requirement of "invention, imagination, or talent."

---

**16.** *See* W.B. Yeats, "Among School Children" (1927) ("O body swayed to music, O brightening glance, / How can we know the dancer from the dance?"). For an entertaining and judicious treatment of expression in exotic dance, from Richard Strauss' *Salome* (1905) to Gypsy Rose Lee, *see Miller v. Civil City of South Bend*, 904 F.2d 1081, 1089–95 (7th Cir.1990) (Posner, J., concurring); *see also Flashdance* (Paramount 1983) (arc-welder by day and exotic dancer by night gains admission to the Pittsburgh Conservatory of Dance).

As noted above, Defendant failed to establish that Plaintiff exercised the kind of specialized skill characteristic of a person who is in business for herself. Defendant presented no criteria or standards for Plaintiff's "try out" or her performance as a Diamond A dancer. Plaintiff did not have any prior dancing experience; before dancing she was a waitress. Diamond A did not require or encourage any specific dance steps; Diamond A only required that she "had to be moving." Harrell Deposition, pp. 53, 244–45. On the record before it, the Court has no reason to suspect that Plaintiff was doing anything more than "moving." What details and assessments are offered by Defendant are submitted by Dr. Hanna, an authority who admittedly has never visited a Diamond A club, much less observed Plaintiff's dancing. Hanna Affidavit, ¶ 10. At bottom, the Court is left with Plaintiff's bare assertion that she felt a need not to copy other dancers and to invent her own dance steps.[17] This is not sufficient. Having failed to meet its burden of showing that Plaintiff's work required "invention, imagination, or talent," the Court cannot say that Plaintiff is a professional artist within the meaning of § 541.3.

#### (ii) long test

It is clear that any employee who is not a professional under the short test is likely not a professional under the long test. *See Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1074 (1st Cir.1995); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 698 (3rd Cir.1994). Under the long test, a lower monetary threshold ($170) is imposed, and Defendant must show, in addition to showing that the job requires "invention, imagination, or talent" in a recognized field of artistic endeavor, (1) that the employee's work is "original and creative in character," (2) that it requires the "consistent exercise of discretion and judgment," and (3) that it is "predominantly intellectual and varied in character" (as opposed to routine or mechanical). § 541.3(a)-(d). Since defendant has failed to carry its burden of showing that Plaintiff's work required "invention, imagination, or talent," the Court need not address the other, more rigorous requirements of this test.

#### D. Purpose of the FLSA

Defendant argues that Plaintiff is not in the category of those indviduals afforded protection by the FLSA. The purpose of the FLSA is to preclude "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). Defendant argues that affording minimum wage to dancers will not further the purposes of the FLSA.[18]

Defendant points out that Plaintiff decided to become a dancer because the money she was making as a waitress (at minimum wage minus the applicable tip credit) was not enough. In essence, Defendant is arguing that a person who receives as much as $1,000 a week from dancing does not need minimum wage or overtime protection. Defendant's argument is specious. There is no "economic reality" test for wages. None of the courts in the cases cited by Defendant for this argument actually denied application of the FLSA, much less denied it because the employee was making more (from tips or other sources) than minimum wage. Indeed, some of the cases cited by Defendant support the opposite conclusion. *See Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir.1977)

---

17. Dr. Hanna herself concedes that although dancers seek new ways of sending the message of eroticism in dance, they may also "innovatively use make-up, hair style and color, nails, perfume, costume, gimmicks, props, voice, banter and even silicone implants" to compete with one another. Hanna Affidavit, ¶ 34. *See also* Karter Deposition, pp. 10, 17 (dancer on go-go gram made more money than others because she "let the guys touch her" and did other things the other dancers considered "bad hygiene and bad taste").

18. Defendant also suggests that imposing a minimum wage "would have the exact opposite result." The possibility (and the irony) that a decision to protect the allegedly exploited dancer may in fact deter the nightclub from engaging any (or as many) dancers in the future is not lost on the Court. *See Reich v. ABC/York–Estes Corp.*, 157 F.R.D. 668, 682–83 (N.D.Ill.1994) (dancers petition to intervene denied notwithstanding allegation that application of FLSA will jeopardize continued existence of nightclub). However, the same danger accompanies the application of any pro-labor legislation.

(FLSA read broadly to effect purpose of act and to protect employee who "voluntarily separated" from employer); *Walling v. Rutherford Food Corp.*, 156 F.2d 513 (10th Cir.1946) (FLSA read broadly to effect purpose of act, to look beyond "independent contractor" label, and to find protection thereunder).

More to the point, monies that dancers receive from customers are tips, not wages, which cannot be applied to offset completely an employer's obligation to pay a minimum wage. *See Reich v. ABC/York–Estes Corp.*, 1997 WL 264379 (N.D.Ill.); *Reich v. Priba Corp.*, 890 F.Supp. 586 (N.D.Tex.1995); *Donovan v. Tavern Talent and Placements, Inc.*, 1986 WL 32746 (D.Colo.). The Court therefore finds no merit to this argument.

### E. Estoppel

Defendant argues that Plaintiff is estopped from raising any claim under the FLSA in that (i) she failed to assert she was entitled to minimum wages until after she was terminated, (ii) she failed to file any tax returns for the monies she received (as much as $1,000 per week) from customers while dancing at the Diamond A clubs, and (iii) she failed to report any of the amounts she received to the clubs. All of these arguments are without merit.

### III. CONCLUSION.

Accordingly, it is **ORDERED** and **ADJUDGED** that Defendant's Motions for Partial Summary Judgment (Doc. Nos. 37A and 37) are **DENIED**.